**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 5, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LAMONE M. JOHNSON,

    Plaintiff - Appellant,

v.

DR. SANDERS; RAY LARIMER;
ERNESTO MARTINEZ; SHANNA
TAYLOR; SGT. MORRISON,

    Defendants - Appellees.

No. 23-7031

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:19-CV-00269-JFH-JAR)**
_____

Hannah Keidan and Carleton Plourde, Student Advocates (Steven J. Alagna, Supervising Attorney; Nicholas Blum, Jacob Cogdill, and Madeline Wingert, Student Advocates, on the briefs), Washington University School of Law, Appellate Clinic, St. Louis, Missouri, for Plaintiff – Appellant.

Darrell L. Moore, J. Ralph Moore, P.C., Pryor, Oklahoma, for Defendants – Appellees.
_____

Before **TYMKOVICH**, **MATHESON**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

Plaintiff-Appellant Lamone Johnson, a male-to-female transgender woman,[1] appeals the district court's grant of summary judgment against her on a single 42 U.S.C. § 1983 claim for deliberate indifference to serious medical needs. Ms. Johnson asserted the claim against two Oklahoma prison employees—a prison physician and the prison's health services administrator—flowing from the decision to discontinue the hormone replacement therapy (HRT) Ms. Johnson had been taking for three years prior to her incarceration at the facility where Defendants-Appellees are employed. The district court concluded that no reasonable jury could find Defendants acted with deliberate indifference to Ms. Johnson's medical needs because her HRT was discontinued in compliance with correctional policy. That policy, the district court concluded, did not permit Defendants to continue Ms. Johnson's HRT after a correctional psychologist rendered an opinion that she did not have gender dysphoria.

On appeal, Ms. Johnson asserts that a reasonable jury could find deliberate indifference under three distinct theories. Because Ms. Johnson has not adduced record facts sufficient to support a jury's determination that Defendants acted with deliberate indifference under any theory advanced, we affirm the district court's grant of summary judgment.

---

[1] Ms. Johnson's opening brief appends a document suggesting her name has been legally changed to Marylin Monae Morleah-Mezelle Green-Porter; because the caption of this action has not been changed, we use the surname "Johnson" to avoid confusion.

## I.    BACKGROUND

While Ms. Johnson was detained at the Oklahoma County jail pending sentencing on state charges, a jail physician diagnosed her with gender dysphoria and prescribed her two HRT medications—estradiol, an estrogen steroid hormone, and spironolactone, a testosterone blocker. Following sentencing, on September 22, 2016, Ms. Johnson was remanded to the custody of the Oklahoma Department of Corrections (ODOC). Thereafter, the ODOC transferred Ms. Johnson through three additional ODOC prisons over the course of fourteen months. At all times, Ms. Johnson was continued on her HRT regimen.

By March 26, 2018, the ODOC had transferred Ms. Johnson to the Dick Conner Correctional Center. Less than a month later, Ms. Johnson submitted a health services request seeking an increase to her dosages of HRT. Three days later, the prison informed Ms. Johnson that she had "been scheduled to discuss with the provider." ROA Vol. I at 118.

On May 1, 2018, a staff psychologist, Patricia L. Jones, Psy.D., who is not named as a defendant in this action, evaluated Ms. Johnson. Less than two weeks later, on May 11, Dr. Jones issued a report ("the Jones Report") which purported to "document the presence or absence of the diagnostic criteria for Gender Dysphoria per the DSM-5 [i.e., the Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders], as well as any additional information relevant to the question of if it is in the best interest of the inmate's psychological health to provide hormone therapy." ROA Vol. I at 122.

3

After setting forth Ms. Johnson's history, the Jones Report summarized the results of three self-report assessments completed by Ms. Johnson, including the "Minnesota Multiphasic Personality Inventory-2" (MMPI-2) and the "Gender Identity/Gender Dysphoria Questionnaire for Adults and Adolescents" (GIDYQ-AA). *Id.* at 126. Dr. Jones credited Ms. Johnson's MMPI-2 responses to conclude that Ms. Johnson had "diagnostic markers of both Histrionic and Narcissistic Personality Disorders." *Id.* at 127. Individuals with this result, Dr. Jones explained, "have delusions of grandeur" and "blame others for what they perceive to be injustices done to them." *Id.*

The result of Ms. Johnson's GIDYQ-AA assessment—which produces a number score "with lower scores showing increased levels of gender dysphoria"— was a score of 1.4, which was "extremely low compared to the mean of biological adult males experiencing gender dysphoria ($M$ [Mean] = 2.49, $SD$ [Standard Deviation] = .41) as opposed to biological male, heterosexual adults not experiencing gender dysphoria ($M$ = 4.85, $SD$ = .22)." *Id.* at 126–27. But Dr. Jones doubted the validity of Ms. Johnson's low score: "Of interest is inmate Johnson's almost absolute answers. All answers except one were either Always or Never. Inmate Johnson identified himself as a Woman, with no uncertainty whatsoever, and stated that in the last 12 months he has frequently wished for gender reassignment surgery." *Id.* at 127.

Next, Dr. Jones discussed and applied the DSM-V's standards for the diagnosis of gender dysphoria, which requires that "two criteria be met." *Id.* The first criterion "relates to the incongruence between one's experienced/expressed gender

4

and the assigned gender . . . [as] manifested by two of six possible factors." *Id.*

Dr. Jones concluded that Ms. Johnson satisfied more than two of the six possible

factors, though she seemingly doubted at least some of Ms. Johnson's answers

regarding those factors. *See id.* at 128 ("Inmate Johnson desires to be seen as a

woman, but spent no time or detail discussing what it would mean to be treated as a

woman."); *id.* ("Inmate Johnson only expressed interests in specific traditional

female roles when describing his employment history. Inmate Johnson had far more

focus on his role as an entertainer than as a woman.").

But as to the second DSM-V criterion for gender dysphoria—"association of

the condition with clinically significant distress in social, occupational, and/or other

areas of functioning"—Dr. Jones concluded that "Inmate Johnson does not appear to

be experiencing clinical levels of anxiety and/or depression related to Gender

Dysphoria." *Id.* Rather, Dr. Jones opined, "Inmate Johnson appears to be

experiencing significant levels of distress due to a diagnostically relevant Personality

Disorder." *Id.*

In a paragraph titled "Conclusions and Recommendations," Dr. Jones opined

as follows:

> It is the opinion of the evaluating psychologist that the distress fueled by
> Inmate Johnson's Personality Disorder was expressed by Inmate Johnson
> through the use of his sexuality via social media, on stage adult
> entertainment, and prostitution. Inmate Johnson's use of gender and sexuality
> to attract attention provided ample opportunity for him to receive positive
> attention, as noted in his comment during the interview that "Facebook is
> where I found the most support." The current political climate provided, and
> continues to provide, a socially defensible position for calling out anyone
> who declines to applaud Inmate Johnson's presentations as "haters." This

provides Inmate Johnson with attentional support for the symptoms of Histrionic Personality Disorder, as well as a ready supply of the anticipated "unworthy" people needed to continue supporting the features of Narcissistic Personality Disorder.

*Id.* at 128–29. Dr. Jones thus concluded that "Inmate Johnson does not meet the criteria for Gender Dysphoria," and that "the distress fueled by a documented personality disorder is the primary factor fueling his dysphoric mood." *Id.* at 121.

The Jones Report concluded by noting that Ms. Johnson was "currently receiving Hormone Treatment for Gender Dysphoria," and that it would be up to "medical staff" to "determine[] if continuation, advancement, or discontinuation of the Hormone Treatment is in the best interest of Inmate Johnson." *Id.* at 129. And in the report's cover page, Dr. Jones "advised that Inmate Johnson meet with his primary QMHP [qualified mental health provider] to discuss this summary and the general findings." *Id.* at 121.

Five days later, on May 16, Ms. Johnson was transferred to Davis Correctional Facility (DCF), a private prison owned and operated by CoreCivic (now rebranded as Corrections Corporation of America) that houses ODOC inmates pursuant to a contract with the ODOC. Both named Defendants are employed at DCF.

Less than a week later, on May 22, Ms. Johnson met with Victoria Shepherd, DCF's mental health coordinator. During that meeting, as summarized by Ms. Shepherd, Ms. Johnson "state[d] that he no longer feels that he is in need of mental health services and would like to discontinue" remeron—an antidepressant medication—because, as Ms. Johnson told her, "my hormones cover my depression,

6

so I don't need anything now. I'm doing ok. I am respected here." ROA Vol. III at 180. Ms. Shepherd accordingly had Ms. Johnson sign a waiver of "all mental health services including Remeron," *id.* at 181, and Ms. Johnson was advised that she should submit "a sick call request" in the event she felt she needed mental health "services again in the future," *id.* at 180.

The next day, May 23, Defendant Dr. Sanders, a DCF physician, reviewed Ms. Johnson's health records, including the Jones Report. Dr. Sanders developed the "opinion that in order for us to remain consistent with [O]DOC policy," Ms. Johnson's HRT "would need to be discontinued." ROA Vol. II at 43. Dr. Sanders ordered a taper of those medications to minimize "unwanted side effects," and he assigned mental health personnel to Ms. Johnson pursuant to his recommendation that she "have follow-up with the facility's mental health staff." *Id.*

The ODOC policy referenced by Dr. Sanders—OP-140147, "Management of Gender Nonconforming Inmates" ("the Policy"), *id.* at 60—states as follows with respect to HRT:

1. Hormonal treatment of inmates with Gender Dysphoria may be undertaken only after all the following occurs;

   a. Diagnosis of Gender Dysphoria has been confirmed by a qualified mental health professional based on the diagnostic criteria of the *Diagnostic and Statistical Manual of Mental Disorders*.

   b. A . . . "Male to Female Hormonal Therapy Risk and Information Form" . . . is read, signed by the inmate and scanned into the inmate's electronic health record.

2. Once the above steps have been completed, hormonal treatment may be considered by the qualified medical provider if the following:

7

a.  Hormonal treatment was initiated prior to incarceration; or

b.  Surgical castration has occurred, verified by examination and/or medical records; or

c.  The facility medical provider determines hormone treatment is medically necessary and approval from the Chief Medical Officer is obtained.

*Id.* at 63–64.

The same day that Dr. Sanders began tapering off Ms. Johnson's HRT, Ms. Shepherd and DCF's health services administrator, Defendant Ray Larimer, R.N., met with Ms. Johnson to communicate that decision. Nurse Larimer "explained to inmate Johnson that without a confirmed diagnosis of Gender Dysphoria by a qualified mental health professional, the facility's medical provider (Dr. Sanders) and mental health provider ([psychiatrist] Dr. Lantrip) had concluded that the previously prescribed hormonal therapy would be reduced and then eventually discontinued."[2] ROA Vol. II at 58.

Over the next fourteen months, Ms. Johnson would make multiple formal requests related to the discontinuation of her HRT regimen and the Jones Report. On May 23, 2018, Ms. Johnson submitted a "request to staff" directed to Dr. Jones, requesting that her HRT be reinstated and that she be "diagnose[d] . . . with the correct criteria of gender dysphoria." ROA Vol. II at 354. The request was apparently routed to Dr. Jones, who responded that Ms. Johnson needed "to discuss [her]

---

[2] Dr. Sanders and Nurse Larimer both believed that Dr. Jones was the designated ODOC psychologist responsible for conducting gender dysphoria evaluations.

diagnosis with [her] primary QMHP," and that "[a]ll medication decisions are made by medical." *Id.* On July 1, 2018, Ms. Johnson grieved Dr. Jones's response, explaining that "[d]iscontinuing my hormone therapy which I have been on for over 2 years would cause me significant harm [in the form of] vomiting, abdominal pain, breast dysfunction, cancer, depression and could possibly lead up to cutting, self-harm, [and] self castration, which I attempted 3 times in my adolescent years due to the strong discomfort of my genitalia." *Id.* at 353. She requested (1) that she be diagnosed "with the correct criteria of gender dysphoria," (2) that her HRT be reinstated, and (3) that she be referred to an "outside gender dysphoria specialist." *Id.* at 352. Four days later, Nurse Larimer returned the grievance as "unanswered" because, among other reasons, Ms. Johnson first "need[ed] to address this to medical at this facility" (i.e., DCF) per Dr. Jones's direction to "discuss your diagnosis with your primary QMHP." *Id.* at 350–51. Ms. Johnson apparently attempted to appeal the denial of this grievance, and on July 24, the ODOC Administrative Review Authority rejected the appeal on grounds that it "was filed improperly," in part because Ms. Johnson had "failed to follow previous instructions" related to the substantive request. *Id.* at 356.

On July 6, 2018, Ms. Johnson submitted a "request for health services" asking to speak with Dr. Sanders regarding "hormone therapy issues." *Id.* at 357. The next day, she was told that the request had been "referred to [the] provider," *id.* at 357, and four days later, Dr. Sanders responded as follows: "[Y]ou have been evaluated by a designated specialist from ODOC and found that you do not qualify for [HRT] at

9

this time. We have to follow ODOC policy and procedures and due to their findings we are not allowed to over-ride them," ROA Vol. III at 74. Ms. Johnson did not grieve this response.

On October 6, 2018, Ms. Johnson submitted another request to Dr. Sanders complaining of "pain and swelling in [her] breast as well as [her] back," and again requesting that her HRT be renewed. ROA Vol. I at 352–53. A little over a week later she was referred to Dr. Sanders's July 10, 2018, response and was reminded that she was "currently on a weening dose" of spironolactone. *Id.* at 352.

Almost six months later, on March 31, 2019, Ms. Johnson submitted a request for health services, complaining that she was "in pain[;] my back, breast, neck is hurting." *Id.* at 363. Two days later, DCF staff referred the request to the "provider," and noted that Ms. Johnson had "refused" over-the-counter pain medications. *Id.*

On May 2, 2019, Ms. Johnson submitted a request for health services, asking "to speak with the QMHP (Qualified Mental Health Professional) about my gender dysphoria diagnosis." ROA Vol. II at 373. DCF staff referred the request to mental health personnel, but the record is silent as to what occurred thereafter.

On June 6, 2019, Ms. Johnson submitted a request for health services asking to meet "with Dr. Sanders to discuss treatment options about my HRT that was stopped." ROA Vol. I at 366. A week later, on June 13, 2019, Ms. Johnson submitted a request to staff referencing her earlier request for health services and again asking that Dr. Sanders reinstate her HRT. DCF staff responded that "[d]uring your psychologist evaluation you did not meet the criteria for [HRT]," and referred

10

Ms. Johnson back to Dr. Sanders's July 10, 2018, response to an earlier request for reinstatement of HRT. *Id.* at 354. Ms. Johnson grieved that response and requested that her HRT be reinstated. The grievance was denied by Nurse Larimer on grounds that Ms. Johnson had been "evaluated by a psychologist" and she "did not meet the criteria for [HRT]." *Id.* at 358.

Ms. Johnson then appealed the denial of that grievance. At some unknown time before this appeal, Ms. Johnson received a copy of the Jones Report. The appeal detailed Ms. Johnson's attempts to meet with Dr. Sanders regarding Dr. Jones's diagnosis and the decision to discontinue her HRT. "The purpose of this meeting," Ms. Johnson explained, "was a[n] attempt to show my previous medical records and results of another evaluation (prior to my incarceration) and to show documentation written by [an] 'experienced professional' within gender dysphoria." ROA Vol. II at 367–68. The Jones Report, Ms. Johnson explained, "never stated to stop my HRT. That was a decision that Dr. Sanders [and] Ray Larimer made . . . ." *Id.* at 368. She complained that she was "experiencing mental and physical pain" due to that decision, and that her "body [wa]s making a transformation from years of healing my gender dysphoria to now stopping it[.]" *Id.* "I am [severely] depressed without my HRT," Ms. Johnson continued, "[i]t makes me feel less of a woman." *Id.* Ms. Johnson also asserted that Dr. Jones was an "inexperienced psychologist[]," and that such psychologists "often misdiagnose gender dysphoria for a 'psychiatric disorder.'" *Id.* Despite Ms. Johnson's complaints about Dr. Jones's diagnosis, however, the only relief she requested in this appeal was to "reinstate [her] HRT." *Id.*

11

That appeal was denied, again in reliance on the Jones Report: "According to your record, a Qualified Mental Health Professional (QMPH) completed a Gender Dysphoria Forensic Mental Health Assessment report on May 11, 2018[,] and concluded you do not have a current diagnosis of Gender Dysphoria. Therefore, your request to reinstate your hormone replacement therapy (HRT) is denied." *Id.* at 369.

While the above appeal was pending, on July 24, 2019, Ms. Johnson submitted a request for health services asking to be "reevaluated for 'gender dysphoria'" by Dr. Jones. *Id.* at 370. She was told that the health services administrator, Nurse Larimer, would "look into this," but the record does not disclose what occurred thereafter in connection with this request. *Id.*

On August 14, 2019, Ms. Johnson filed this action. In the operative first amended complaint, Ms. Johnson asserted four § 1983 claims, three of which are not at issue in this appeal.[3] Ms. Johnson's second § 1983 claim rested on an alleged Eighth Amendment violation for deliberate indifference to serious medical needs flowing from the discontinuation of her HRT. Ms. Johnson asserted the Eighth Amendment claim against Dr. Sanders and Nurse Larimer, and she sought both money damages and injunctive relief, although she now represents that she is seeking

---

[3] Specifically, in claims one, three, and four, Ms. Johnson asserted a property deprivation claim under the Due Process Clause, a First Amendment retaliation claim, and a discrimination claim under the Equal Protection Clause. The district court granted summary judgment to Defendants on these claims on grounds that Ms. Johnson had not exhausted administrative remedies with respect to them, and Ms. Johnson does not appeal the court's disposition of those claims.

"only monetary damages because she is no longer in ODOC custody." Appellant's Suppl. Br. at 15 n.5.

On April 2, 2021, Defendants moved for summary judgment on the Eighth Amendment claim, arguing that the combination of Dr. Jones's rejection of a gender dysphoria diagnosis and the Policy precluded a finding of deliberate indifference, and that Ms. Johnson's complaint amounted to no more than a difference of opinion regarding the appropriate care to which she was entitled.

The district court granted summary judgment to Defendants on the Eighth Amendment claim. The court adopted Defendants' arguments that no reasonable jury could find deliberate indifference because (1) the Policy precluded Defendants from considering whether to continue Ms. Johnson's HRT, and (2) Ms. Johnson's preferred treatment—HRT—was merely different from what Defendants provided, and that the care she was offered was constitutionally adequate.

This timely appeal followed.

## II.    STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *See Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016). In doing so, we stand in the same shoes as the district court and "must view the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Id.* (quotation marks omitted). We will affirm a grant of summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute

13

is genuine when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a fact is material when it 'might affect the outcome of the suit under the governing [substantive] law.'" *Bird*, 832 F.3d at 1199 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.   ANALYSIS

The Eighth Amendment proscribes the infliction of "cruel and unusual punishments" against convicted prisoners. U.S. Const. amend. VIII. Aside from its prohibition of certain punishments, the amendment establishes "the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). For purposes of § 1983 liability, state actors run afoul of the Eighth Amendment when they act with "deliberate indifference to serious medical needs of prisoners." *Id.* at 104.

The deliberate indifference standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). As such, the standard encompasses both an objective and subjective component. *See Est. of Beauford v. Mesa County.*, 35 F.4th 1248, 1262 (10th Cir. 2022). "The objective component examines whether the medical condition or harm claimed by the inmate was sufficiently serious to be cognizable," while the "subjective component analysis then considers whether the defendant knew of and disregarded the serious risk to the inmate's health." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir. 2022) (internal quotation marks omitted). "[T]his

14

level of intent can be demonstrated through circumstantial evidence." *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005).

Under the subjective component, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837). "A plaintiff 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate.'" *Paugh v. Uintah County*, 47 F.4th 1139, 1156 (10th Cir. 2022) (quoting *Farmer*, 511 U.S. at 842). "Rather, it is enough that an official 'merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Id.* (quoting *Farmer*, 511 U.S. at 843 n.8). But "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999).

Ms. Johnson claims, and Defendants do not dispute, that "the medical need for gender-affirming care is 'sufficiently serious' to satisfy the objective component" of the deliberate indifference standard. Appellant's Suppl. Br. at 19. We therefore assume, without deciding, that Ms. Johnson has satisfied the objective component of deliberate indifference. *See Hardeman v. Smash*, No. 21-7018, 2022 WL 470741, at *3 (10th Cir. Feb. 16, 2022) (unpublished) ("We assume, without deciding, that

gender dysphoria satisfies the objective component.");[4] *Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018) ("The seriousness of Michelle's [gender dysphoria] is uncontested for purposes of summary judgment. Thus, the only substantive issue is whether the existing treatment constituted deliberate indifference to Michelle's gender dysphoria.").

Ms. Johnson presents three theories of deliberate indifference that she submits a reasonable jury could credit based on the summary judgment record. First, she asserts that a reasonable jury could find Defendants acted with deliberate indifference by discontinuing her HRT in the first instance. Second, she argues that a reasonable jury could conclude that even after the cessation of her HRT, Defendants denied her *any* form of gender affirming care, thereby evincing deliberate indifference. And finally, Ms. Johnson urges that a reasonable jury could find that Defendants acted with deliberate indifference in failing to discharge their "gatekeeping" obligation, which, Ms. Johnson posits, required Defendants to arrange for a second psychological evaluation for the presence or absence of gender dysphoria.

We analyze each theory below and conclude that no reasonable jury could find deliberate indifference on these facts. We therefore affirm the judgment of the district court.

---

[4] We cite unpublished decisions for their persuasive value only as they are not binding precedent. 10th Cir. R. 32.1(A).

### A.    HRT Discontinuation

Ms. Johnson's first theory is that Defendants acted with deliberate indifference by intentionally interfering with the course of HRT treatment she had been prescribed for years before she arrived at DCF.

The parties' briefing—both before the district court and on appeal—largely fails to distinguish between Dr. Sanders and Nurse Larimer for purposes of deliberate indifference. But because the deliberate indifference standard is concerned with a defendant's knowledge or actual awareness of facts from which an inference may be drawn, it demands an individualized assessment. The conceptual confusion engendered by Ms. Johnson's combined deliberate indifference analysis is most evident under this first theory, which rests on the decision to discontinue Ms. Johnson's HRT. The record evinces that only Dr. Sanders—who concedes he is "the qualified medical provider" at DCF who could permissibly prescribe HRT under the Policy—made the decision to taper and then discontinue Ms. Johnson's HRT, not Nurse Larimer. ROA Vol. II at 42. Accordingly, Nurse Larimer cannot be liable under any theory resting on the decision to discontinue HRT, and we affirm the grant of summary judgment in his favor on this theory. We proceed, however, to consider Ms. Johnson's discontinuation theory as to Dr. Sanders. *See Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) ("The [§ 1983] plaintiff must show the defendant personally participated in the alleged [constitutional] violation.").

A defendant's "[f]ailure to act in accordance with or intentional interference with *prescribed* medical treatment or instructions can give rise to an Eighth

17

Amendment claim." *Paugh*, 47 F.4th at 1162 (quotation marks omitted). Indeed, in holding that deliberate indifference to serious medical needs violates the Eighth Amendment, the Supreme Court contemplated that such standard may be satisfied when a defendant "intentionally interfere[s] with [medical] treatment once prescribed." *Estelle*, 429 U.S. at 105.

Ms. Johnson argues that because she had been prescribed HRT by medical providers at other ODOC facilities, Dr. Sanders's decision to discontinue this treatment at DCF amounts to deliberately indifferent "interference" with medical care. Appellant's Suppl. Br. at 25. The problem with this reasoning, however, is that Dr. Sanders did not "interfere" with prescribed treatment. Rather, Dr. Sanders, as a medical provider, decided to *change* the prescribed treatment.

In this respect, *Paugh*, a case on which Ms. Johnson heavily relies, is instructive. In that case, a detainee was examined at a non-correctional hospital in advance of his admission into a county jail. *Paugh*, 47 F.4th at 1148. The examining physician diagnosed him with alcohol withdrawal and prescribed him medication to "mitigate [his] alcohol-withdrawal symptoms." *Id.* When the arresting officers brought him to the county jail, they apprised jail personnel of his alcohol withdrawal diagnosis as well as the medication he was prescribed to treat it. *Id.* at 1149. Where the record established that a jailer later failed to give the inmate his medication "when he knew about [the inmate's] need for it," we concluded that a jury could find deliberate indifference. *Id.* at 1162–63; *accord Casanova v. Ulibarri*, 622 F. App'x 724, 728–29 (10th Cir. 2015) (unpublished) (finding deliberate indifference satisfied

18

where prison warden personally refused inmate access to medical equipment for which he had prescription).

By contrast, here, Dr. Sanders was not in the position of a jail official tasked merely with implementing a course of treatment. Rather, as Ms. Johnson's treating physician, he was charged with *directing* the appropriate course of medical treatment following Dr. Jones's rejection of a gender dysphoria diagnosis. Thus, to survive summary judgment, Ms. Johnson must adduce record facts on which a jury could find that in deciding to taper and then discontinue Ms. Johnson's HRT, Dr. Sanders appreciated but nevertheless disregarded a serious risk to her health or safety. But Ms. Johnson has not pointed to any such facts, and our review of the record discloses none. Because Dr. Sanders was presented with a psychological evaluation that specifically concluded that Ms. Johnson did not suffer from gender dysphoria, the serious risk of tapering her off HRT did not exist. And without additional facts capable of generating an inference that Dr. Sanders otherwise knew or strongly suspected that such a risk did exist, he cannot be said to have acted with deliberate indifference. No reasonable jury could conclude that Dr. Sanders was deliberately indifferent by discontinuing Ms. Johnson's HRT, through a taper regimen, in reliance on (1) a negative gender dysphoria diagnosis rendered by an ODOC employee charged with confirming or rejecting such diagnoses, and (2) the Policy that forbade

19

him from continuing Ms. Johnson's HRT in the absence of a gender dysphoria diagnosis.[5]

However, we do not agree that Dr. Sanders's compliance with the Policy immunized him from liability under § 1983—a proposition that Defendants' counsel expressly adopted at oral argument in this matter. A defendant's contemporaneous reliance on correctional policy to take, or decline to take, a course of action indeed bears on the question of deliberate indifference. That standard informs the requisite intent with which a defendant behaves, so the avowed *reason* for a defendant's conduct is naturally relevant to this analysis. *See Arenas v. Calhoun*, 922 F.3d 616, 626 (5th Cir. 2019) ("Although an officer's compliance with prison policy by no means immunizes his actions from liability under § 1983, it militates against a finding of deliberate indifference."); *Ford v. Anderson County.*, 102 F.4th 292, 312 n.10 (5th Cir. 2024) ("If it is the case that Nurse Green delayed sending Newsome to the hospital because of the PR bond policy, the fact that Green acted pursuant to municipal policy may aid in Green's defense.").

But although compliance with policy bears on a defendant's state of mind, it is not dispositive because correctional policy does not define the rights and obligations enshrined in the Constitution. It is uncontroversial, for example, that a defendant's

---

[5] This conclusion holds even if we define the risk of serious harm as the effects flowing from cessation of HRT rather than the psychological distress caused by gender dysphoria. With respect to discontinuation effects, it is uncontroverted that Dr. Sanders ordered a monthslong taper of the relevant medications with an eye toward minimizing "unwanted side effects" from withdrawal. ROA Vol. II at 43.

*deviation* from correctional policy, without more, does not amount to a constitutional violation. *See George ex rel. Bradshaw v. Beaver County.*, 32 F.4th 1246, 1254 (10th Cir. 2022) ("Failing to comply with jail policy does not amount to a constitutional violation on its own."). The standards established by the Constitution are not necessarily coextensive with those imposed by correctional policy: "[V]iolation of a prison regulation does not give rise to an Eighth Amendment violation absent evidence the prison official's conduct failed to conform to the constitutional standard." *Porro v. Barnes*, 624 F.3d 1322, 1329 (10th Cir. 2010) (quotation marks omitted) (rejecting inmate's assumption that correctional "policy and the Constitution are congruent," and rebuffing argument that "failure to abide" by the policy amounts "to automatic or *per se* proof of deliberate indifference"); *Mata*, 427 F.3d at 757 ("While published [correctional] requirements for health care do not create constitutional rights, such protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm."). The same is true with respect to compliance with a prison policy.

Where a defendant has subjective knowledge that a course of action or inaction required by policy creates or fails to address a serious risk to an inmate's health or safety, he may not escape constitutional liability by disregarding such risk in compliance with the policy. In such circumstances, the Constitution demands more of state actors charged with overseeing the carceral punishment of a convicted prisoner.

But where, as here, there are no record facts establishing Dr. Sanders's actual knowledge—or awareness "of facts from which [an] inference could be drawn"—that

21

a substantial risk of serious harm exists, no reasonable jury could find that he acted with deliberate indifference by hewing to correctional policy. The district court therefore correctly granted summary judgment in favor of Dr. Sanders on this theory.

### B.     Complete Denial of Care

Next, Ms. Johnson argues a reasonable jury could find that Defendants effectively denied her *any* care for gender dysphoria, thereby displaying deliberate indifference. Although our precedent establishes that § 1983 defendants can be held liable for withholding, with deliberate indifference, *any* form of treatment for gender dysphoria, the summary judgment record cannot support such a finding here.

It is well settled that "doing nothing in the face of serious medical needs" runs afoul of the Eighth Amendment. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1139 (10th Cir. 2023). Further, "merely doing *something* (with no reference to the underlying condition) does not necessarily insulate one from liability." *Id.* (explaining that if "providing only *some* modicum of treatment" were sufficient, "every institutional doctor or gatekeeping official could shield themselves from constitutional liability by simply prescribing any mild over-the-counter pain reliever, regardless of symptoms" (internal quotation marks omitted)). Rather, courts "determine whether there was the functional equivalent of a complete denial of care in light of the specific circumstances." *Id.*

In *Lamb*, we identified four currently available modes of treatment for gender dysphoria: changes in gender expression and role, hormone therapy to make the body feminine or masculine, surgery to change primary or secondary sex characteristics,

22

and psychotherapy. 899 F.3d at 1161. Ms. Johnson argues that "a reasonable jury could conclude that [she] did not receive any of" these four forms of treatment. Appellant's Suppl. Br. at 30.[6]

> The district court concluded that Ms. Johnson in fact received medical care:

> The medical treatment that was provided to Plaintiff was different from what she wanted. While she may have benefitted from participating in counseling and other mental health services while housed at DCF, she refused and waived receipt of medical services, thereby limiting her options for treatment of her documented personality disorder. Plaintiff was, however, periodically seen by the facility psychiatrist, the facility's nurse practitioner, and other member [*sic*] of the facility's nursing and mental health staff.

ROA Vol. II at 448.

As Ms. Johnson correctly notes, the district court's reliance on her waiver of mental health services was misplaced. The record is unambiguous that the reason Ms. Johnson waived mental health treatment, as reflected in verbatim notes entered by DCF staff, was that "my hormones cover my depression, so I don't need anything now. I'm doing ok. I am respected here." ROA Vol. III at 180. As is clear from Ms. Johnson's contemporaneous account, when she executed the mental health treatment waiver on May 22, 2018, she was unaware that the very next day, Dr. Sanders would decide to taper and then discontinue the precise treatment Ms. Johnson said was alleviating her mental and emotional distress. Indeed, there is no dispute that Ms. Johnson knew nothing about the results of Dr. Jones's evaluation

---

[6] *Lamb* does not provide on-point support for Ms. Johnson because there the appellant had a gender dysphoria diagnosis and here, she does not. *See Lamb v. Norwood*, 262 F. Supp. 3d 1151, 1153 (D. Kan. 2017), *aff'd*, 899 F.3d 1159 (10th Cir. 2018).

or had any inkling that discontinuation of her yearslong HRT regimen was a possibility when she waived mental health treatment.

But while we reject the waiver theory, we nevertheless conclude that this record is devoid of facts to suggest that Defendants denied or were otherwise unwilling to provide Ms. Johnson *any* gender affirming care.

The record evinces that Ms. Johnson frequently requested *one* form of gender affirming care—HRT. *See* ROA Vol. II at 352 ("Reinstate my hormone therapy which has been discontinued . . . ."); *id.* at 354 ("Reinstate my hormone therapy . . . ."); *id.* at 357 ("I need to speak with Dr. Sanders pertaining to my hormone therapy issues."); *id.* at 374 ("I am requesting to 'meet' with Dr. Sanders to discuss treatment options about my HRT . . . ."); ROA Vol. I at 352 ("Reinstate, renew, my HRT . . . ."); *id.* at 356 ("Reinstate my estradiol 2mg and spironolactone 50 mg . . . ."). But the denial of HRT reinstatement, without more, is not sufficient to prevail under a complete denial of care theory because a convicted prisoner is not constitutionally entitled to their preferred treatment, and a prisoner's disagreement with a course of treatment is insufficient to establish a constitutional violation. *See Perkins*, 165 F.3d at 811.

Seemingly recognizing this obstacle, Ms. Johnson points to two requests that did not explicitly seek reinstatement of her HRT. On September 16, 2018, she requested "to speak with [Victoria] Shepherd," a mental health specialist at DCF. ROA Vol. II at 359. The next day, Ms. Shepherd entered a note on the request reflecting that she met with Ms. Johnson that day. *Id.* This document contains no

24

other information regarding the substance of that meeting, much less that Ms. Johnson had requested non-HRT forms of treatment for her gender dysphoria but was denied the same. Neither does Ms. Johnson provide that information by declaration. The most that can be said of this record evidence, then, is that when Ms. Johnson requested to speak with a mental health specialist, that request was honored.

Next, Ms. Johnson points to her May 2, 2019, request "to speak with the QMHP (Qualified Mental Health Professional) about my gender dysphoria diagnosis." *Id.* at 373. DCF staff referred that request to mental health personnel, and the record is devoid of any indication that either of the named Defendants denied Ms. Johnson the opportunity to meet with a QMHP.

In short, this record does not contain facts sufficient to support a reasonable jury's conclusion that Ms. Johnson was denied *any* gender affirming care. And even if the record established that both of the above requests to meet with mental health specialists were in fact rebuffed, Ms. Johnson's complete denial of care theory could not succeed against *these* Defendants since there is no record evidence connecting the action or inaction of Dr. Sanders or Nurse Larimer to these requests for mental health services provided by others at DCF. Summary judgment in favor of Defendants was therefore proper.

## C.    *Gatekeeping*

Finally, Ms. Johnson asserts that a jury could determine that by failing to arrange for a gender dysphoria evaluation by someone other than Dr. Jones,

25

Defendants acted with deliberate indifference. She argues that it should have been

"obvious" to Defendants that the Jones Report's rejection of gender dysphoria "was

unsupported by the conclusions and analysis on the face of" the report, and further

that the report "should have prompted Defendants to question [Dr. Jones's]

partiality—and therefore capability," such that Defendants should have allowed

Ms. Johnson "to see a specialist, or arrang[e] an assessment from another QM[HP]."[7]

Appellant's Suppl. Br. at 36–37, 39.

The subjective component of deliberate indifference may be satisfied under a

"gatekeeper" theory—that is, when a defendant "prevents an inmate from receiving

treatment or denies access to someone capable of evaluating the inmate's need for

treatment." *Lucas*, 58 F.4th at 1137; *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th

---

[7] Ms. Johnson notes that inmates have repeatedly sued Dr. Jones and others based on Dr. Jones's rejection of gender dysphoria diagnoses in favor of personality disorders. *See Hardeman v. Smash*, No. 21-7018, 2022 WL 470741, at *1 (10th Cir. Feb. 16, 2022) (unpublished) (alleging that Dr. Jones rejected a "suspected" gender dysphoria diagnosis in favor of "Histrionic Personality Disorder"); *Porter v. Crow*, No. 18-CV-0472-JED-FHM, 2020 WL 620284, at *3–4 (N.D. Okla. Feb. 10, 2020) (alleging that Dr. Jones rejected an affirmative gender dysphoria diagnosis made by prior ODOC medical doctor in favor of "schizotypal personality disorder," in part because Dr. Jones thought inmate was "masquerading as a woman" given that inmate's "choice of careers and interests" were "typically male dominated"); *see also Halliwell v. Allbauch*, No. CIV-18-1152-D, 2019 WL 1128761, at *2 (W.D. Okla. Mar. 12, 2019) (alleging that Dr. Jones instructed another doctor to change inmate's gender dysphoria diagnosis and to "not treat her for" gender dysphoria).
    Although Ms. Johnson raises the possibility that Dr. Jones has a penchant for rejecting gender dysphoria diagnoses in favor of never-before-diagnosed personality disorders, there is nothing in this record to suggest that Dr. Sanders and Nurse Larimer were aware of Dr. Jones's practices. And because Ms. Johnson has not sued Dr. Jones in this litigation, whether Dr. Jones acted with deliberate indifference or negligence in her diagnosis of Ms. Johnson is beyond the scope of our review.

Cir. 2000) (recognizing gatekeeping liability for denial of "access to medical personnel capable of evaluating the need for treatment"). Our precedent "illustrate[s] that when a jail official knows, or 'refuse[s] to verify underlying facts that he strongly suspected to be true, or decline[s] to confirm inferences of risk that he strongly suspected to exist' about an inmate's serious medical need, the official's failure to obtain medical assistance constitutes deliberate indifference." *Paugh*, 47 F.4th at 1159 (quoting *Farmer*, 511 U.S. at 843 n.8). When this subjective element is present, the "inquiry under a gatekeeper theory is . . . whether [defendants] fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs." *Lucas*, 58 F.4th at 1139.

Defendants maintain that because they are "medical professional[s]," they are not, as a matter of law, gatekeepers charged with facilitating care for Ms. Johnson. Appellees' Suppl. Br. at 20–21. This is incorrect. That a defendant provides medical care does not foreclose gatekeeping liability: medical professionals "can occupy both positions of gatekeeper and provider simultaneously." *Lucas*, 58 F.4th at 1143 n.5. Thus, gatekeeping liability "can apply to medical professionals when the professional knows that his or her role in a medical emergency is solely to refer the patient to another." [8] *Id.* at 1137.

---

[8] While Nurse Larimer sometimes acts as a provider of medical care, his position as Health Services Administrator expressly encompasses a healthcare gatekeeping role: "As Health Services Administrator at [DCF], . . . . I oversee the scheduling of visits between the inmates and our facility doctors, dentists, optometrists, psychiatrists, and other health care professionals." ROA Vol. II at 54.

Although it is not the case that Defendants are relieved of any obligation to facilitate care for their patients when the required care is outside their expertise or authority, to establish deliberate indifference Ms. Johnson must show that Defendants knew or strongly suspected that a need for such care existed. Ms. Johnson asserts that the Jones Report itself "should have" caused Defendants to doubt its diagnostic conclusions. Appellant's Suppl. Br. at 36, 37. But this record is devoid of any facts on which a jury could rest a determination that Defendants *in fact* knew or strongly suspected that Dr. Jones's diagnosis was wrong. At bottom, Ms. Johnson seeks to impose on Defendants a duty of care requiring them to scrutinize a diagnosis rendered in the ordinary course by a professional in a different medical discipline. She asks for more than the deliberate indifference standard requires.

To comply with their constitutional obligations, Defendants were not required to search for flaws in Dr. Jones's diagnosis, even if that diagnosis was made negligently and even if Defendants acted with negligence by failing to discern defects therein. Rather, to create a triable issue of fact as to Defendants' state of mind, Ms. Johnson was, at minimum, required to adduce record evidence on which a jury could find that Defendants "strongly suspected" that Dr. Jones had wrongly diagnosed her, and that a substantial risk to her health and safety therefore existed. *Farmer*, 511 U.S. at 843 n.8 ("It is not enough merely to find that a reasonable person would have known, or that the defendant should have known . . . ."). Stated simply, Ms. Johnson cannot satisfy the subjective knowledge requirement by pointing to non-obvious problems that Defendants *should have* discerned in the Jones Report.

28

Neither are Ms. Johnson's diagnosis-related grievances sufficient to establish the subjective component. The record does not disclose that Dr. Sanders was involved in the resolution of any of Ms. Johnson's submissions that raised concerns about Dr. Jones's diagnosis. But construing the grievance record in the light most favorable to Ms. Johnson, the following information was known to Nurse Larimer because it was included on submissions from Ms. Johnson he reviewed:

(1) that Ms. Johnson believed Dr. Jones did not use "the correct criteria of gender dysphoria," ROA Vol. I at 346;[9]

(2) that Ms. Johnson believed Dr. Jones to be an "inexperienced psychologist[]," and that such psychologists "often misdiagnose gender dysphoria for a 'psychiatric disorder,'" ROA Vol. II at 368;

(3) that Ms. Johnson possessed "documentation" of "another evaluation (prior to [her] incarceration)" that shows that she did "meet the criteria for gender dysphoria," *id.*

Notably, nothing in the relevant grievance history would have alerted Nurse Larimer to the possibility of bias on the part of Dr. Jones. Instead, at most, these materials alerted Nurse Larimer to Ms. Johnson's and another psychologist's disagreement

---

[9] In this grievance, Ms. Johnson noted that she had separately filed an "Emergency Grievance" seeking similar relief from the ODOC's Personal Identity Administrative Review Authority (PIARA), a committee tasked, under the Policy, with considering a gender nonconforming inmate's requests for assessment of health care needs. ROA Vol. I at 346. Apart from this stray reference, however, the record is devoid of any indication that Ms. Johnson pursued that review mechanism, much less that either Nurse Larimer or Dr. Sanders were involved.

with Dr. Jones's diagnostic evaluation. But "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Perkins*, 165 F.3d at 811; *see Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."). And Ms. Johnson faces an even steeper hill here because it is uncontroverted that Nurse Larimer believed "that Dr. Jones was *the* qualified mental health professional for [O]DOC regarding Gender Dysphoria and that Dr. Jones was conducting *all* evaluations of [O]DOC inmates for Gender Dysphoria." ROA Vol. II at 57 (second emphasis added). In short, Nurse Larimer's awareness that Ms. Johnson and another, unspecified psychologist disagreed with Dr. Jones's rejection of a gender dysphoria diagnosis is not capable, without more, of supporting a reasonable jury's conclusion that Nurse Larimer knew or strongly suspected that Dr. Jones's diagnosis was wrong.[10]

In sum, on this record, no reasonable jury could find that Defendants acted with deliberate indifference by declining to facilitate a second gender dysphoria evaluation.

---

[10] Moreover, in response to the first grievance in which Ms. Johnson implied that Dr. Jones had not used the "correct criteria for gender dysphoria," Nurse Larimer reiterated Dr. Jones's direction to "discuss your diagnosis with your primary QMHP . . . . at this facility." ROA Vol. I at 343. Far from shirking his gatekeeping obligations, then, in this instance Nurse Larimer directed Ms. Johnson to the appropriate channel through which Ms. Johnson could discuss her diagnosis with DCF's mental health personnel.

## IV.    CONCLUSION

For the reasons stated, we AFFIRM the judgment of the district court.