FILED
United States Court of Appeals
Tenth Circuit

June 10, 2026

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DANNY JOSEPH JARVIS,

     Plaintiff - Appellant,

v.

LAWSON LIGGETT, a/k/a Weston
County Detention Center Officer Liggett;
LARAMIE FRANK, individually, a/k/a
Weston County Sheriff's Department
Officer Frank; JASON JENKINS,
individually, a/k/a Weston County
Detention Center Administrator,

     Defendants - Appellees,

and

WESTON COUNTY DETENTION
CENTER; BRYAN COLVARD, Weston
County Sheriff; AUSTIN WELLS, a/k/a
Weston County Sheriff's Department
Officer Wells,

     Defendants.

No. 25-8046

_____

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 1:23-CV-00103-SWS)**

_____

Megan Mooney, University of Colorado Law School Appellate Advocacy Program
(Matthew Cushing, Counsel of Record; Cleo Williams, and Zachary Thompson, with her
on the briefs), Boulder, Colorado, for Plaintiff-Appellant.

Prentice Olive, Assistant Attorney General (Timothy W. Miller, Senior Assistant Attorney General, with him on the brief), Cheyenne, Wyoming, for Defendants-Appellees.

_____

Before **HARTZ**, **MATHESON**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

Plaintiff-Appellant Danny Joseph Jarvis was incarcerated at the Weston County Detention Center ("WCDC") in Wyoming from May to July of 2023. While incarcerated, he suffered dental pain that resulted in three trips to the emergency room. Mr. Jarvis sued several WCDC officials—including Defendants-Appellees Lawson Liggett, Laramie Frank[1], and Jason Jenkins (collectively, "Defendants")—under 42 U.S.C. § 1983, claiming they were deliberately indifferent to his serious medical needs in violation of the Eighth and Fourteenth Amendments.[2] The district court granted summary judgment in favor of Defendants, concluding that Mr. Jarvis did not provide sufficient evidence to support a jury determination that Defendants

_____

[1] The docket incorrectly lists Defendant Laramie Frank's name as Frank Laramie. The record and appellate briefing, however, indicate that his first name is Laramie, and his last name is Frank. We therefore direct the Clerk to correct this error and identify Laramie Frank accordingly.

[2] Throughout his brief, Mr. Jarvis claims his right to be free from detention officers' deliberate indifference to his serious medical needs is a right protected by the Eighth Amendment. At all times relevant to this claim, Mr. Jarvis was a pretrial detainee, meaning his claim is governed by the Fourteenth Amendment. *See Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018). We will thus refer to Mr. Jarvis's claim as one asserting a Fourteenth Amendment violation.

2

acted with deliberate indifference toward his dental needs. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

### A.    *Factual History[3]*

#### 1.    Mr. Jarvis's Incarceration at WCDC

Mr. Jarvis was incarcerated at WCDC from May 22 to July 24, 2023. WCDC is a small detention center in Wyoming with only thirty-two available beds and staffed with only seven detention officers. The facility does not have contracted medical professionals on-site, so detention officers must either schedule medical appointments for inmates or transport them to the emergency room when they need medical attention.

WCDC's Standard Operating Practices ("SOPs") ensure that inmates are entitled to receive any necessary medical or dental care, regardless of their ability to pay. To request care, inmates submit a medical request, and the detention officer who receives it then places it in a folder in the booking room. If the request is "of a serious nature" and "should not wait," however, the detention officer will instead "call the nurse or physician immediately to advise them of the medical situation." ROA Vol. 1 at 54. The officer "shall then follow the nurse or physician's orders as necessary." *Id.*

---

[3] "Because this case arises from an appeal of summary judgment, we present the . . . factual background in the light most favorable to [Mr. Jarvis] as the non-moving party, unless contradicted by the record." *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1284 (10th Cir. 2022).

Detention officers transport inmates to the emergency room when needed. Upon return, the transporting officer will place a copy of the discharge papers from the emergency room visit in the inmate's file. On-duty officers or the incoming shift will then review the medical documents in the file and take any necessary follow-up actions, such as writing down medications that need to be administered or scheduling follow-up medical appointments. Sheriff Bryan Colvard, WCDC's official policymaker, stated that day-shift officers and the jail administrator, who was Lieutenant Jenkins during Mr. Jarvis's time at WCDC, are responsible for scheduling inmates' medical appointments. To keep track of appointments, WCDC officers write them on a whiteboard at the facility.

**2.    Mr. Jarvis's Emergency Room Visits**

While incarcerated, Mr. Jarvis experienced "severe[,] excruciating pain" due to missing, broken, and cavitied teeth. Suppl. ROA Vol. 2 at 42. Because of Mr. Jarvis's pain, he went to the emergency room three times during the two months he was in WCDC custody. We describe each visit and the events that followed below.

*a.    First Emergency Room Visit*

On May 28, 2023, Officer Frank transported Mr. Jarvis to the emergency room. Mr. Jarvis's chief complaint was leg pain, but he also complained of a broken tooth. The nurse practitioner who treated him, Patrick Gleason, observed that Mr. Jarvis had multiple missing and broken teeth but that there was "[n]o evidence of acute abscess." ROA Vol. 2 at 244. Nurse Practitioner Gleason prescribed Mr. Jarvis Ibuprofen for his pain. He also instructed Mr. Jarvis to rinse his mouth several times

4

daily with saltwater and peroxide rinses and to avoid hot or cold beverages and crunchy or chewy foods. Finally, he instructed Mr. Jarvis to see a dentist within two days. Officer Frank was present and heard Nurse Practitioner Gleason give these instructions to Mr. Jarvis. Officer Frank also signed and received Mr. Jarvis's discharge papers, which included an after-visit summary detailing Nurse Practitioner Gleason's instructions and prescriptions.

After the visit, Officer Frank took Mr. Jarvis back to WCDC. It was a Sunday evening when they returned. Officer Frank gave Mr. Jarvis's discharge papers from the emergency room to the incoming shift. When Officer Frank returned to WCDC for his subsequent shifts, he "was aware . . . that detention officers at [WCDC] were attempting to make an appointment" for Mr. Jarvis to see a dentist. ROA Vol. 1 at 161. However, no appointment was scheduled for Mr. Jarvis to see a dentist within the two-day timeframe instructed by Nurse Practitioner Gleason.

On June 1, 2023, after the two-day timeframe had passed, Mr. Jarvis submitted an inmate request form reminding WCDC staff that he needed a dental appointment and asking when he would go to the dentist. Officer Frank received Mr. Jarvis's request, and Officer Zach Benshoof, who was not named as a defendant in this suit, responded, stating that an appointment would be made at Mr. Jarvis's expense.[4]

---

[4] Although it is not entirely clear from the record why Officer Benshoof told Mr. Jarvis he would need to pay for the appointment, the record suggests that Mr. Jarvis may have been able to go to a different dentist at an earlier date if he met the dentist's requirement to prepay a down payment.

After Mr. Jarvis's first emergency room visit, he "persistently reminded Officer Frank of the pain [he] was in, and that [he] was told to see a dentist within 2 days." Suppl. ROA Vol. 2 at 44. Seven times, Officer Frank brought Mr. Jarvis Ibuprofen or Tylenol for his pain, and on each instance, Mr. Jarvis told Officer Frank that he "was long overdue on going to the dentist." *Id.* at 42. Officer Frank told Mr. Jarvis that he "would eventually be taken to the dentist." *Id.* at 44.

Although Officer Frank provided Mr. Jarvis with pain medication, he gave Mr. Jarvis an oral rinse only once, despite Nurse Practitioner Gleason's instruction that Mr. Jarvis rinse his mouth several times daily, alternating between saltwater and peroxide. Mr. Jarvis asked Officer Frank to provide him with saltwater or peroxide rinses multiple times but never received the rinses. When Mr. Jarvis asked about the rinses, Officer Frank said he would "check into it." *Id.*

b.    *Second Emergency Room Visit*

On June 16, 2023, Mr. Jarvis submitted a medical request asking to go to the emergency room for his dental pain. Officer Liggett, who was not working a regular shift, was called in so he could take Mr. Jarvis to the emergency room. During the appointment, Officer Liggett sat a few feet away from Mr. Jarvis. Mr. Jarvis told the doctor, Deborah Weems, that his pain amounted to a seven on a ten-point scale and that he had not received the oral rinses that Nurse Practitioner Gleason instructed him to use during his first emergency room visit.

Dr. Weems observed that Mr. Jarvis had cavities, missing teeth, and broken teeth down to the gumline. She prescribed Mr. Jarvis penicillin to treat his infection

6

and instructed him to see a dentist in seven days when he finished his weeklong course of medication. Dr. Weems noted that Mr. Jarvis had not been receiving oral rinses, but she did not repeat the instruction that Mr. Jarvis had received at his first emergency room visit to rinse his mouth with saltwater and peroxide. Dr. Weems explained that Mr. Jarvis's pain would "not go away until the tooth is fixed or pulled." ROA Vol. 2 at 308.

After the visit, Officer Liggett transported Mr. Jarvis back to WCDC and placed the discharge papers in a file for the incoming officers to review. Officer Liggett then returned home because he was called into WCDC for the sole purpose of transporting Mr. Jarvis to the emergency room.

On seven instances during Officer Liggett's subsequent shifts, he brought Mr. Jarvis medication to treat his pain. Each time, Mr. Jarvis told Officer Liggett that he was in serious pain and needed to see a dentist. But after Mr. Jarvis's emergency room visit on June 16, 2023, Officer Liggett noticed on WCDC's whiteboard that Mr. Jarvis had an upcoming dental appointment scheduled for August 4, 2023. Officer Liggett understood "that this dentist appointment would address [Mr.] Jarvis's current dental complaint and any other dental complaints he made before that appointment." ROA Vol. 1 at 190. He also understood "that the appointment . . . was the earliest that detention officers had been able to schedule for [Mr.] Jarvis to see the dentist." *Id.* As a result, Mr. Jarvis did not go to the dentist within the seven-day timeframe that Dr. Weems had instructed.

Mr. Jarvis also communicated with other officers about his appointment between his emergency room visits. For example, Mr. Jarvis testified in a deposition that another officer, who he identified as Officer Drew, told him he could write a letter to his family to ask for money so he could go to an earlier dental appointment at a dentist that would require Mr. Jarvis to pay upfront. The jail administrator, Lieutenant Jenkins, also responded to Mr. Jarvis's inquiries as to the amount of the deposit his family would need to pay so he could visit a different dentist at an earlier date. Lieutenant Jenkins informed Mr. Jarvis that he could ask his family or friends for that information.

### c.    Third Emergency Room Visit

On June 29, 2023, Officer Liggett was again called in to WCDC to transport Mr. Jarvis to the emergency room. This time, Mr. Jarvis reported that his pain had increased to a nine on the ten-point scale. The physician who treated him, Dr. Cary Bybee, prescribed antibiotics and gave Mr. Jarvis an injection for his pain. Dr. Bybee did not instruct Mr. Jarvis to schedule a follow-up dental appointment.

On July 24, 2023, Mr. Jarvis was released from WCDC on bond so he could go to a drug addiction treatment facility. Accordingly, his upcoming dental appointment was cancelled.

### B.    Procedural History

Based on the events described above, Mr. Jarvis brought this civil rights action under 42 U.S.C. § 1983 against several entities and officials, including Defendants Frank, Jenkins, and Liggett. Mr. Jarvis alleged that Defendants violated his

Fourteenth Amendment right to be free from cruel and unusual punishment by (1) failing to schedule a dental appointment within the timeframe ordered by medical professionals and (2) denying him the oral rinses that a nurse practitioner instructed him to use.

Mr. Jarvis and Officer Liggett filed cross-motions for summary judgment. Officer Frank and Lieutenant Jenkins did not move for summary judgment; however, the district court informed the parties it was "considering granting summary judgment in favor of non-movants Defendant Laramie Frank and Defendant Jason Jenkins." ROA Vol. 1 at 13. It gave the parties additional time to make arguments or file materials they wanted the district court to consider. All three Defendants invoked the doctrine of qualified immunity, arguing they were not deliberately indifferent to Mr. Jarvis's dental needs and that, even if they were, they did not violate clearly established law.

The district court agreed with Defendants and granted summary judgment for them on qualified immunity grounds. First, the district court held Defendants were entitled to qualified immunity on Mr. Jarvis's claim that they violated the Fourteenth Amendment by failing to schedule a dental appointment within the two-day and seven-day timeframes that medical professionals had prescribed during Mr. Jarvis's emergency room visits. It concluded that Mr. Jarvis did not provide sufficient evidence establishing that Defendants had a duty to schedule his dental appointment under the relevant WCDC policies. And the district court further held that the

evidence did not show that Defendants "*intentionally* delayed or denied him from receiving an earlier appointment." ROA Vol. 1 at 379.

Second, the district court considered Mr. Jarvis's claim that Officer Frank failed to provide him with the saltwater and peroxide rinses that he was instructed to use daily after his first emergency room visit. The district court held that Officer Frank was entitled to qualified immunity on this claim, too, because Mr. Jarvis did not establish that Officer Frank personally participated in the alleged constitutional violation, or that Officer Frank was deliberately indifferent to Mr. Jarvis's dental needs.

Third, the district court held that even if a constitutional violation occurred, Defendants did not violate clearly established law. Thus, they were entitled to qualified immunity, and the district court granted summary judgment in favor of Defendants. Mr. Jarvis timely appealed.

## II.   DISCUSSION

Mr. Jarvis contends that the district court erred when it granted Officers Frank and Liggett (the "Officers") summary judgment on qualified immunity grounds.[5]

---

[5] The district court granted summary judgment for Officer Frank, Officer Liggett, and Lieutenant Jenkins. Mr. Jarvis did not expressly limit his appeal to the district court's grant of summary judgment for Officers Frank and Liggett. But he did not make any arguments regarding whether Lieutenant Jenkins was entitled to qualified immunity. Nor did he respond to Defendants' argument that Mr. Jarvis waived any argument as to Lieutenant Jenkins by not raising it in his opening brief. Thus, we consider any argument as to Lieutenant Jenkins's liability under 42 U.S.C. § 1983 waived. *See United States v. Clay*, 148 F.4th 1181, 1201 (10th Cir. 2025) ("It is well-settled that arguments inadequately briefed in the opening brief are waived." (quotation marks omitted)).

First, he asserts that the Officers violated his constitutional rights by failing to timely schedule a dental appointment for him and that Officer Frank violated his constitutional rights by failing to provide him with saltwater and peroxide oral rinses. Second, Mr. Jarvis argues that the Officers were not entitled to qualified immunity because it was clearly established in 2023 that failing to schedule a medically ordered follow-up appointment, substantially delaying medical care, and denying an inmate medically prescribed treatment violates the Fourteenth Amendment. We disagree.

### A.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We view the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Lowther v. Child. Youth & Fam. Dep't*, 101 F.4th 742, 756 (10th Cir. 2024). We review a district court's "grant[ ] of summary judgment based on qualified immunity de novo." *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) (quotation marks omitted).

Qualified immunity is an affirmative defense that "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Once asserted, it "creates a presumption that the defendant is immune from suit." *Crowson v. Wash. Cnty. Utah*, 983 F.3d 1166, 1178 (10th Cir. 2020) (quotation

11

marks and brackets omitted). To overcome this presumption at the summary judgment stage, the plaintiff must "show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Est. of Smart ex rel. Smart v. City of Wichita*, 951 F.3d 1161, 1169 (10th Cir. 2020) (quotation marks omitted). "If the plaintiff fails to make either showing, the defendant is entitled to qualified immunity." *Lowther*, 101 F.4th at 756.

### B.    *Constitutional Violation*

Mr. Jarvis argues that two constitutional violations occurred. First, he asserts that both Officers violated his right to be free from cruel and unusual punishment by failing to schedule his dental appointment within the timeframes that the emergency room providers instructed. That is, he argues Officer Frank should have scheduled a dental appointment for him by May 30, 2023, two days after Mr. Jarvis went to the emergency room for the first time on May 28, 2023. And he contends that Officer Liggett should have arranged for Mr. Jarvis to go to the dentist by June 23, 2023, within seven days of his second emergency room visit on June 16, 2023. Second, Mr. Jarvis argues that Officer Frank violated his constitutional rights by denying him access to the saltwater and peroxide oral rinses that the nurse practitioner at his first emergency room visit instructed him to use. Even viewing the evidence in Mr. Jarvis's favor, we conclude that a reasonable jury could not find that the Officers committed a constitutional violation.

1.    **Legal Standard**

The Eighth Amendment prohibits inflicting "cruel and unusual punishments" on convicted prisoners. U.S. Const. amend. VIII; *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243–44 (1983). "Aside from its prohibition of certain punishments, the amendment establishes 'the government's obligation to provide medical care for those whom it is punishing by incarceration.'" *Johnson v. Sanders*, 121 F.4th 80, 88 (10th Cir. 2024) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Although the Eighth Amendment protects the rights of convicted prisoners, the Fourteenth Amendment extends the Eighth Amendment's "degree of protection against denial of medical attention" to pretrial detainees like Mr. Jarvis. *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (quotation marks omitted).

Under the applicable standard, state actors violate the Constitution when they act with "deliberate indifference to serious medical needs of prisoners." *Estelle*, 429 U.S. at 104. "The deliberate indifference standard lies 'somewhere between the poles of negligence at one end and purpose or knowledge at the other.'" *Johnson*, 121 F.4th at 88 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

A § 1983 plaintiff must satisfy an objective and subjective component to prevail on a claim that prison officials were deliberately indifferent to his serious medical needs. *Quintana v. Santa Fe Cnty. Bd. of Commr's*, 973 F.3d 1022, 1028–29 (10th Cir. 2020). The objective component "examines whether the medical condition or harm claimed by the inmate was sufficiently serious to be cognizable." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir. 2022) (quotation marks

omitted). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (internal quotation marks omitted).

Under the subjective component, an "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837). A prison official whose role in a medical situation "is solely to serve as a gatekeeper for other medical personnel capable of treating the condition" may be liable "if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference." *Sealock*, 218 F.3d at 1211. "But 'prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.'" *Est. of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1263 (10th Cir. 2022) (quoting *Farmer*, 511 U.S. at 844).

## 2.    Failure to Timely Schedule Appointment

The Officers do not dispute Mr. Jarvis's claim that he "suffered considerable pain" because his dental appointment was scheduled outside of the timeframe directed by the medical professionals at his emergency room visits. Appellant's Br. at 32. We therefore assume, without deciding, that Mr. Jarvis has satisfied the objective component of the deliberate indifference standard. *See Crowson*, 983 F.3d at 1178 (assuming the plaintiff met the objective component of the Eighth

14

Amendment standard without deciding because the defendant argued only that "he was not deliberately indifferent under the subjective component"); *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (noting that a delay in medical care may satisfy the objective component of the deliberate indifference standard if the delay resulted in "considerable pain").

The parties' dispute instead centers on the subjective component of the deliberate indifference standard. Mr. Jarvis argues that the Officers had a duty to schedule his dental appointment within the two- and seven-day timeframes the emergency room providers directed, and he maintains that a reasonable jury could find that the Officers intentionally delayed or denied him from obtaining a dental appointment at an earlier date. In contrast, the Officers assert that they did not have a duty to schedule Mr. Jarvis's dental appointment because the day-shift officers who reviewed his discharge paperwork from the hospital were responsible for doing so. They also argue that they did not intentionally delay or deny Mr. Jarvis's dental appointment and were therefore not deliberately indifferent to Mr. Jarvis's serious dental needs.

### a.     *Duty to Schedule Appointments*

The Officers contend they did not have the duty to schedule Mr. Jarvis's dental appointment because, under WCDC policy, day-shift officers are responsible for scheduling inmates' medical appointments, and they were not day-shift officers when they learned that Mr. Jarvis had been instructed to see a dentist within a prescribed timeframe. In the following analysis, we first address the Officers' argument and

15

conclude they were not responsible for scheduling Mr. Jarvis's appointment and were therefore not deliberately indifferent to his medical needs. We then consider, and ultimately reject, Mr. Jarvis's three arguments as to why the Officers nonetheless had a duty to schedule his dental appointment.

i.        Analysis

The Officers argue, and the district court agreed, that they cannot be held liable for the alleged constitutional deprivation because they did not have a duty to schedule Mr. Jarvis's dental appointment. In any § 1983 case, "a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established." *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006) (affirming the district court's dismissal of a complaint that failed to allege that the named defendants were the individuals responsible for the alleged constitutional deprivation). And the deliberate indifference standard demonstrates the need for this "individualized assessment," given its "concern[ ] with a defendant's knowledge or actual awareness of facts from which an inference may be drawn." *Johnson*, 121 F.4th at 90.

We regularly rely on jail officials' roles and responsibilities to determine whether they may be subject to § 1983 liability for an alleged constitutional violation. For example, we have recognized that an officer has not personally participated in an Eighth Amendment violation when the officer's role was limited to denying or otherwise responding to an inmate's grievance form. *See, e.g.*, *Requena v. Roberts*, 893 F.3d 1195, 1216 (10th Cir. 2018).

16

We have similarly limited the reach of § 1983 liability in situations where the named defendant did not have the responsibility to provide the plaintiff with the medical care that was allegedly lacking. In one such case, a registered nurse knew an inmate had heart attack symptoms but followed the prison's protocol to report those symptoms to a nurse practitioner. *See Mata*, 427 F.3d at 756, 759. Because the nurse fulfilled her "gatekeeper duty" to connect the inmate with a medical professional, any subsequent constitutional deprivations could not be attributed to her. *Id.* at 759; *see also Johnson*, 121 F.4th at 89–90 (granting summary judgment in favor of a nurse based on her lack of personal participation in the alleged constitutional violation of discontinuing medical care because a different official, the doctor, was responsible for making the decision to discontinue the inmate's medical treatment).

Our sister circuits have applied similar principles in the context of § 1983 claims involving detention officers' failure to schedule or timely schedule an inmate's follow-up medical appointment. *See, e.g.*, *Hernandez v. Keane*, 341 F.3d 137, 147 (2d Cir. 2003) (affirming summary judgment for prison officials who allegedly failed to schedule the plaintiff's follow-up medical appointment because the person responsible for scheduling medical appointments was a different individual who was not named as a defendant); *Norwood v. Ghosh*, 723 F. App'x 357, 363–64 (7th Cir. 2018) (affirming summary judgment for a jail physician based on a nine-month delay in the plaintiff's surgery because the defendant physician was not responsible for the scheduling delay).

17

At WCDC, the responsibility of scheduling medical appointments falls on the jail administrator and day-shift officers. Although the Officers knew the emergency room providers had instructed Mr. Jarvis to see a dentist, neither Officer Frank nor Officer Liggett had the responsibility of scheduling Mr. Jarvis's dental appointment because they were not then working as day-shift officers.

On May 28, 2023, during Mr. Jarvis's first emergency room visit, Officer Frank learned the nurse practitioner had instructed Mr. Jarvis to see a dentist within two days. However, Mr. Jarvis has not presented evidence or made any argument on appeal that Officer Frank was working as a day-shift officer when he transported Mr. Jarvis to the emergency room. In fact, Mr. Jarvis appears to agree that Officer Frank was not a day-shift officer when he took Mr. Jarvis to the emergency room because his only argument regarding the policy is that it imposed a duty on Officer Frank to schedule his dental appointment during Officer Frank's day shifts that occurred *after* May 28, 2023.

In contrast, Officer Frank provided evidence that he returned from the emergency room with Mr. Jarvis after 5:00 p.m. on a Sunday, that "[i]t was not [his] responsibility to make a dental appointment for [Mr.] Jarvis," and that he understood his responsibility to be giving Mr. Jarvis's discharge papers to the incoming shift to handle, which he did. ROA Vol. 1 at 161–62. Without evidence controverting Officer Frank's stated subjective understanding of his responsibilities, we must accept that Officer Frank believed that day-shift officers had the responsibility to schedule

Mr. Jarvis's dental appointment and that his own duties were limited to providing those officers with Mr. Jarvis's paperwork.

A similar analysis applies to Officer Liggett. When Officer Liggett transported Mr. Jarvis to the emergency room on June 16, 2023, he "was not working a regularly scheduled shift." ROA Vol. 1 at 190. Instead, he was called in specifically to transport Mr. Jarvis to the emergency room. He heard the doctor's instructions and knew Mr. Jarvis needed to see a dentist within seven days, but he was not working as a day-shift officer, so he placed the discharge papers in Mr. Jarvis's file for the incoming shift and then went home. There is no evidence that Officer Liggett understood his responsibility to be anything beyond "providing the transport and placing [Mr.] Jarvis's discharge paperwork in his inmate file for on duty officers or the oncoming shift." *Id.*

To the extent the Officers had a gatekeeper duty, they fulfilled it when they placed Mr. Jarvis's discharge papers in a file for the incoming officers to review. The incoming day-shift officers then had the duty to schedule the appointment, not the officers named as defendants in this suit. Officer Frank stated: "I was aware that following [Mr.] Jarvis's emergency room visit on May 28, 2023, . . . detention officers at [WCDC] were attempting to make an appointment for [Mr.] Jarvis." *Id.* at 161. And this was Officer Liggett's understanding, too. He stated that he "was not involved in attempts to schedule dental appointments for [Mr.] Jarvis," and that after Mr. Jarvis's second emergency room visit, he "observed that a dental appointment had been scheduled for [Mr.] Jarvis on August 4, 2023." *Id.* at 190.

19

Relying on *Hardy v. Rabie*, 147 F.4th 1156, 1165 (10th Cir. 2025), Mr. Jarvis asserts that "[j]ail officials are not given a free pass to deliberately ignore an inmate's serious medical needs simply because a shift change was forthcoming that allowed another jail official to come by and render medical attention later." In *Hardy*, however, the detention officer knew the plaintiff was suffering extreme pain in his cell that was obvious to any layperson, but the officer left the inmate alone in his cell and declined to seek any medical assistance. *Id.* at 1166–67. After "some meaningful amount of time passed," a shift change occurred, and the incoming shift obtained medical assistance for the plaintiff. *Id.* at 1162, 1164–65. We held that the officer who initially ignored the plaintiff's serious medical needs could not avoid liability simply because after a shift change, the new officers assisted the plaintiff. *Id.* at 1166–67.

The facts here are different than in *Hardy*. The Officers did not ignore Mr. Jarvis's need to see a dentist. They did not attempt to schedule Mr. Jarvis's appointment because they understood the day-shift officers would do so. Contrary to the officer in *Hardy*, the Officers did not hold off on fulfilling a responsibility waiting for a shift change. Rather, they followed WCDC policy and placed Mr. Jarvis's discharge papers in his file for the day shift to review and to make any follow-up appointments. The Officers were not acting with deliberate indifference to Mr. Jarvis's needs because they were unaware they had any responsibility to schedule his dental appointment. Instead, they fulfilled their duty to pass on the instructions

20

from the emergency room providers to the incoming day-shift officers who were responsible for making the appointment.

ii.    Counterarguments

Mr. Jarvis puts forth three arguments as to why the Officers had a duty to schedule his dental appointment within the providers' timeframes, despite not acting as day-shift officers when they transported him to the emergency room on May 28 and June 16, 2023. First, he argues that the Officers were responsible for scheduling his dental appointment because they returned to WCDC to work as day-shift officers in the days following Mr. Jarvis's emergency room visits. Second, he asserts that the SOPs governing inmate medical requests at WCDC imposed a duty on the Officers to schedule his dental appointment. Third, he contends that the Constitution supersedes WCDC policy, so the Officers cannot rely on jail policy to avoid liability under § 1983 for violating Mr. Jarvis's constitutional rights. We address each of these arguments in turn and explain why we are not persuaded.

First, Mr. Jarvis argues that the Officers had a duty to schedule his dental appointment because they returned to WCDC to work as day-shift officers in some of their shifts after they transported him to the emergency room. But this argument ignores that when the Officers returned to work subsequent day shifts, they believed that other WCDC officers had already undertaken the responsibility of scheduling Mr. Jarvis's dental appointment. Officer Frank, for example, stated in an affidavit that he believed other officers were scheduling the appointment, and Mr. Jarvis did not provide any evidence negating that Officer Frank held that subjective belief.

21

Officer Liggett stated that after Mr. Jarvis's second emergency room visit, he understood that a dental appointment had *already* been scheduled for Mr. Jarvis that would address his dental needs. Officer Liggett believed that this appointment was the earliest available appointment that could be scheduled for Mr. Jarvis. Again, there is no evidence that Officer Liggett knew or suspected that other officers had not actually scheduled Mr. Jarvis's appointment or that an earlier appointment could have been scheduled. *See Mata*, 427 F.3d at 756 (explaining that the deliberate indifference standard focuses on the officers' state of mind at the time he had contact with the plaintiff and not on events that occurred subsequently). Indeed, the evidence suggests that officers other than Officers Frank and Liggett *had* taken on the responsibility of scheduling Mr. Jarvis's appointment.

Mr. Jarvis attempts to overcome this conclusion by arguing that WCDC officers did not even begin scheduling his appointment until after his third emergency room visit on June 30, 2023. This matters, according to Mr. Jarvis, because it rebuts the Officers' evidence that they understood other officers were scheduling Mr. Jarvis's dental appointment after his emergency room visits. He also argues it renders irrelevant whether an earlier appointment was available because Mr. Jarvis could not obtain an earlier appointment if the officers made no attempt to schedule one until June 30, 2023.

The only evidence marking the temporal point at which WCDC officers scheduled Mr. Jarvis's August 4 dental appointment establishes that it was scheduled after June 16, 2023. Officer Liggett stated in an affidavit that he observed

Mr. Jarvis's appointment on the whiteboard where WCDC officers write inmates' upcoming medical appointments after June 16, 2023, the date of Mr. Jarvis's second emergency room visit. Mr. Jarvis also testified in a deposition that he was informed of the August 4 appointment sometime between June 12 and June 16, 2023. Mr. Jarvis asks us to disregard his deposition testimony because the transcript suggests that he was confusing events that happened around June 16, 2023, with events that happened around June 29, 2023. Even disregarding his testimony, however, he still has not pointed to any admissible evidence that supports his assertion that his appointment was not scheduled until June 30, 2023. As a result, Mr. Jarvis has not presented any evidence negating Officer Liggett's understanding that after June 16, 2023, other officers had scheduled a dental appointment for Mr. Jarvis that would take place on August 4, 2023.

Second, Mr. Jarvis points to the SOPs, asserting they imposed a duty on the Officers to schedule his dental appointment. In particular, he references the SOP titled "Health Care Request." ROA Vol. 1 at 54. The SOP sets forth certain procedures governing how inmates may request medical attention. Relevant here is § 3, titled "Procedures," which states:

> 3.1    Medical Request
>
> 3.1.1   Inmates may obtain a health care request form during normal medical call times. . . .
>
> 3.1.2   The inmate must fill out the form as completely as possible describing their medical needs. The inmate must return the form to a Detention Officer who will place the health care request form in the medical care request folder in the booking room.

> 3.1.3    If the health care request is of a serious nature, and should not wait, the handling officer shall call the nurse or physician immediately to advise them of the medical situation. The Detention Officer shall then follow the nurse or physician's orders as necessary.

*Id.*

According to Mr. Jarvis, § 3.1.3 of the SOP imposed a duty on the Officers to schedule his dental appointment within the two-day and seven-day timeframes that the emergency room providers instructed during his visits on May 28 and June 16, 2023. He argues that his medical requests were "of a serious nature," that the Officers were "handling officers" because they took him to the emergency room, and that the medical professionals' instructions to see a dentist within a prescribed timeframe constituted a "nurse or physician's orders" as contemplated by § 3.1.3. Appellant's Reply Br. at 3–4 (quoting ROA Vol. 1 at 54). In contrast, the Officers assert that the policy does not apply to the procedures governing how follow-up medical appointments are scheduled. They note that Mr. Jarvis has not established that his request was "of a serious nature," that the Officers were "handling officers," or that § 3.1.3 imposed a duty specifically on *them*, as opposed to any other detention officer, to schedule the appointment.

The language of § 3.1 supports the Officers' position. In context, the language creates general rules governing how detention officers should handle medical requests from inmates. Although § 3.1.2 provides that detention officers typically would "place the health care request form in the medical care request folder in the booking room," § 3.1.3 creates an exception for medical requests "of a serious

24

nature." ROA Vol. 1 at 54. In such a case, detention officers "shall call the nurse or physician immediately to advise them of the medical situation." *Id.* After the detention officers have called a nurse or physician to advise them of a situation, the officer "shall then follow the nurse or physician's orders as necessary." *Id.*

Section 3.1.3 does not encompass what happened here. The instruction that detention officers shall "follow the nurse or physician's orders as necessary" applies after detention officers had to call a nurse or physician for immediate medical advice. But here, even assuming Mr. Jarvis's medical requests are "of a serious nature," the Officers transported Mr. Jarvis to the emergency room so he could be treated by medical professionals directly. There is no evidence that any officer called a nurse or physician regarding Mr. Jarvis's dental condition to receive instructions before taking Mr. Jarvis to the emergency room as § 3.1.3 describes. Accordingly, the direction that detention officers follow nurse or physician orders is best read as relating to situations in which the inmate is treated on site based on medical advice received from a nurse or physician consulted by telephone.

Even if § 3.1.3 could be read to support Mr. Jarvis's interpretation, there is no evidence that the Officers subjectively understood the SOP to impose a duty on them to schedule Mr. Jarvis's dental appointment. It is uncontroverted that the Officers understood the duty to schedule the dental appointment fell on the day shift. We have emphasized that a jail officer who has the duty to provide access to medical personnel must "know[ ] that his role in a particular medical emergency is solely to serve as a gatekeeper for . . . medical personnel capable of treating the condition."

25

*Hardy*, 147 F.4th at 1166 (quotation marks omitted). But if an officer does not have knowledge of that responsibility, he cannot be held liable even if he delayed or refused to fulfill it. *Id.*; *see also Buchanan v. Turn Key Health Clinics, LLC*, No. 22-7029, 2023 WL 6997404, at *4 (10th Cir. Oct. 24, 2023) (unpublished) (holding that a nurse who called a doctor for advice instead of applying the jail's standing order on "muscular skeletal/sprains" was not deliberately indifferent because she did not believe the standing order applied to the plaintiff's condition).[6] Although the Officers were aware that the SOP existed, they did not understand it to be the authority governing how to handle nonemergency follow-up appointments after an inmate visits the emergency room. Thus, the SOP does not establish that the Officers knew they had a duty to schedule Mr. Jarvis's dental appointment.

Third, Mr. Jarvis argues that the Officers cannot rely on their lack of duty under WCDC's policy because § 1983 liability does not hinge on whether a detention officer complied with a facility's policies. True, "correctional policy does not define the rights and obligations enshrined in the Constitution," although compliance with a jail's policy still "bears on a defendant's state of mind." *Johnson*, 121 F.4th at 91.

But the Officers here are relying on correctional policy only to distinguish themselves from the detention officers who had the duty to schedule Mr. Jarvis's dental appointments. WCDC's policy does not deny inmates from obtaining

---

[6] We cite unpublished cases for their persuasive value only and do not treat them as binding authority. *See United States v. Ellis*, 23 F.4th 1228, 1238 n.6 (10th Cir. 2022).

medically ordered follow-up appointments; it simply indicates who has the responsibility of scheduling them. The Fourteenth Amendment does not preclude a jail from delegating authority and defining responsibilities within its facility. Thus, we are not persuaded that the Officers who Mr. Jarvis named as defendants may be held liable under § 1983 for failing to schedule his dental appointment when WCDC policy did not impose a duty on them to schedule it.

b.    *Conscious Disregard of Excessive Risk*

Regardless of the Officers' duty under WCDC policy, Mr. Jarvis argues that they were deliberately indifferent to his serious medical needs because they knew of but disregarded an excessive risk to his health or safety by not scheduling his appointment within the prescribed timeframes.

We have already discussed many of the reasons that a reasonable jury could not find that the Officers consciously disregarded an excessive risk to Mr. Jarvis's safety: Each gave Mr. Jarvis's discharge paperwork to the incoming officers, and each believed that the day-shift officers had taken on the responsibility of scheduling Mr. Jarvis's appointment. In addition, the Officers cannot be held liable under § 1983 for not scheduling Mr. Jarvis's appointment because "they responded reasonably to the risk" that Mr. Jarvis faced. *See Howard v. Waide*, 534 F.3d 1227, 1239–40 (10th Cir. 2008) ("In determining whether prison officials acted reasonably, we consider what actions they took, if any, as well as available alternatives that might have been known to them.").

While Mr. Jarvis waited for his dental appointment, the Officers took multiple steps to address his pain. They administered Mr. Jarvis's pain medications as prescribed, with each of the two Officers providing pain medication to Mr. Jarvis at least seven times. They also transported Mr. Jarvis to the emergency room each time it was needed for his pain, and the emergency room providers treated his pain on each visit.[7] Because there is no evidence that an earlier dental appointment could have been scheduled or that these Officers had authority to schedule one, Mr. Jarvis has not shown what alternative course of action the Officers could have taken to reduce his harm during the delay. *Cf. Howard*, 534 F.3d at 1240–41 (reversing the grant of summary judgment to defendants who knew of alternative and reasonable solutions to protect the inmate but did "absolutely nothing to protect [him]").

Mr. Jarvis resists this conclusion, arguing that the Officers cannot avoid liability by providing some medical treatment but disregarding specific orders to schedule an appointment within a specific timeframe. He argues that two of our

---

[7] It is not clear whether Officers Frank and Liggett actually made the decision to take Mr. Jarvis to the emergency room after he requested to go on May 28 and June 16, 2023. On May 28, 2023, the evidence provides only that Officer Frank transported Mr. Jarvis to the emergency room. And before Mr. Jarvis's emergency room visit on June 16, 2023, Mr. Jarvis informed detention officers at WCDC that he needed to return to the emergency room for his infection since he could not go to the dentist until August 4, 2023. Officer Liggett was called in to take Mr. Jarvis to the emergency room, but there is no evidence suggesting who called Officer Liggett or who approved the visit other than Officer Liggett's general statement that his duties include "transport[ing] inmates to . . . the emergency room as requested by supervisors." ROA Vol. 1 at 188. Nonetheless, there is nothing to indicate that the Officers ever refused to take Mr. Jarvis to the emergency room to treat his pain after he requested to go.

cases—*Prince* and *Paugh v. Uintah County*, 47 F.4th, 1139 (10th Cir. 2022)—compel this conclusion.

In *Prince*, the plaintiff went to the emergency room three times for various symptoms, including difficulty walking, dizziness, and leg pain. 28 F.4th at 1040. During the first emergency room visit, he was instructed to receive follow-up care within one week. *Id.* During the second visit, the doctor specifically warned that if he did not promptly receive follow-up attention, he could "suffer permanent disability, pain and possibly death." *Id.* The third time, the emergency room providers instructed that the plaintiff should receive follow-up neurological care within ten days and specifically directed the jail officials to make a call to schedule the appointment within one day. *Id.* The plaintiff's medical records put the jail nurse "on notice that follow-up medical treatment was urgent." *Id.* at 1046. However, the plaintiff received no medical evaluations or any of his life-sustaining medications for nineteen days, despite his condition "rapidly deteriorat[ing]" during that time. *Id.* at 1040–41, 1045–46. And despite the nurse's knowledge of the plaintiff's symptoms, which amounted to a medical emergency, she did not order that he be taken to a hospital. *Id.* at 1046. Accordingly, we held that a factfinder could conclude the jail nurse was deliberately indifferent to the plaintiff's serious medical needs. *Id.* at 1045–46.

In *Paugh*, the plaintiff was diagnosed with chronic alcoholism and withdrawal. 47 F.4th at 1148. The doctor specifically instructed jail officials to administer medication as needed and to seek medical attention if the plaintiff's condition worsened. *Id.* at 1149. The plaintiff's withdrawal symptoms began to worsen, and

despite many officers knowing about the deterioration of his condition, nobody took him to the hospital, attempted to investigate how serious his needs were, or otherwise attempted to contact a medical professional for advice. *Id.* at 1148–52. The plaintiff died. We held that a jury could find the jail officials were deliberately indifferent to the plaintiff's needs. *Id.* at 1158–65.

The facts here are distinguishable. Mr. Jarvis is correct that the inquiry is "not whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to . . . afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1139 (10th Cir. 2023); *see also Est. of Jensen ex rel. Jensen v. Clyde*, 989 F.3d 848, 860 (10th Cir. 2021) (concluding that a nurse was deliberately indifferent to a patient's medical needs by providing Gatorade instead of referring the patient for serious stomach problems). But here, the only risk the Officers knew of was Mr. Jarvis's pain while he waited for a dental appointment. And his pain is the exact issue the Officers treated when they administered his prescribed medication and took him to the emergency room. We therefore conclude that Mr. Jarvis failed to come forward with evidence from which the jury could find that the Officers were deliberately indifferent to his pain while he waited for his scheduled dental appointment on August 4, 2023. *See Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (rejecting an inmate's claim that "he was made to suffer for eighteen months while the prison failed to provide him with a heart specialist and

surgery" where he was appropriately treated for his pain through medication and hospital visits before receiving surgery).

### 3.    Failure to Provide Oral Rinses

Mr. Jarvis also claims that Officer Frank was deliberately indifferent to his medical needs by failing to provide him with the daily saltwater and peroxide oral rinses that he was instructed to use during his first emergency room visit. Despite Mr. Jarvis's multiple requests, Officer Frank only once provided an oral rinse to Mr. Jarvis and later told Mr. Jarvis that he would "check into" the situation. Suppl. ROA Vol. 2 at 44. Contrary to Mr. Jarvis's argument, a reasonable jury could not conclude that Officer Frank's conduct rises to the level of a constitutional violation.

We again assume without deciding that Mr. Jarvis has met the objective component of the deliberate indifference standard because Officer Frank has not disputed Mr. Jarvis's assertion that he had a serious medical need. We conclude, however, that Mr. Jarvis failed to provide evidence that could meet the subjective prong. We have held that the "[f]ailure to act in accordance with or intentional interference with prescribed medical treatment or instructions can give rise to an Eighth Amendment claim." *Paugh*, 47 F.4th at 1162 (quotation marks and emphasis omitted) (holding a reasonable jury could find that a jail official was deliberately indifferent to the plaintiff's medical needs because the official did not provide the plaintiff with his medication when his symptoms were worsening despite the doctor's specific instruction to do so). But we have never held that a jail official's failure to follow a doctor's instruction regarding an inmate's medical treatment is a per se

31

constitutional violation. *See Ajaj v. United States*, 293 F. App'x 575, 579–81 (10th Cir. 2008) (unpublished) (concluding that jail officials who did not place an inmate in smoke-free housing even though a doctor recommended it were not deliberately indifferent to the plaintiff's health or safety because they took various other precautions to prevent his exposure to smoke). Although the objective prong of deliberate indifference may be satisfied by showing that the inmate's condition is "one that has been diagnosed by a physician as mandating treatment," the subjective prong looks to the defendant's actions as a whole, considering whether the defendant "knew [the inmate] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quotation marks omitted).

Even when a jail official knows that a medical provider has instructed a certain treatment, the jail official must have subjective knowledge that disregarding the instruction will result in an excessive risk to the inmate's health or safety. For example, we have explained that a medical provider's failure to consistently check an inmate's vital signs, despite instructions to do so, would not amount to deliberate indifference if the medical provider did not know of and consciously disregard the inmate's serious medical needs. *Strain v. Regalado*, 977 F.3d 984, 995 n.8 (10th Cir. 2020); *see also Martin v. Bd. of Cnty. Commr's*, 909 F.2d 402, 404, 406 (10th Cir. 1990) (denying officers' assertion of qualified immunity where there was evidence that they knew not only that a medical provider recommended the pretrial

32

detainee not be moved without using a gurney or wheelchair, but they also knew that disregarding this instruction could result in the detainee's paralysis).

Other circuits have emphasized that "deliberate indifference is an onerous standard for the plaintiff, and forgetting doses of medicine, however incompetent, is not enough to meet it." *Zentmyer v. Kendall Cnty.*, 220 F.3d 805, 811–812 (7th Cir. 2000) (holding that officers' failure to "occasionally to administer doses of medicine without knowledge that serious consequences might result from their lack of diligence in treating an earache" was insufficient to create a jury question on deliberate indifference); *Mahan v. Plymouth Cnty. House of Corrs.*, 64 F.3d 14, 18 (1st Cir. 1995) (concluding that an inmate who was denied prescribed medication for seven days did not provide sufficient evidence of deliberate evidence because the officers were not subjectively aware that the inmate would suffer serious medical consequences without the medication). Rather, courts generally require "additional exacerbating hardships" or a conscious disregard "in the face of medical risks" before concluding that an officer's failure to follow a doctor's instructions amounts to deliberate indifference. *Zentmyer*, 220 F.3d at 812 (collecting cases); *but see Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 796 (8th Cir. 2006) ("[T]he knowing failure to administer prescribed medicine can itself constitute deliberate indifference.").

Here, Officer Frank did not decline to administer any prescription medication. Instead, he consistently provided Mr. Jarvis with the pain medication prescribed. However, the after-visit summary in Mr. Jarvis's discharge papers from the first emergency room visit treated oral rinses differently than the Ibuprofen he was

33

prescribed for pain. In the section indicating Mr. Jarvis's medications, only Ibuprofen was listed. So, too, with the section listing medications to be picked up at the pharmacy. In a separate "Instructions" section of the discharge papers there are various directions, including taking acetaminophen or the prescribed Ibuprofen for pain, rinsing his mouth with saltwater and peroxide several times daily, "[a]void[ing] too hot or too cold beverages," and "[a]void[ing] crunchy or chewy foods." ROA Vol. 1 at 95. WCDC also does not consider saltwater and peroxide to be medications, so they are not included on the jail's over-the-counter medication sheet. Instead, officers may provide oral rinses to inmates upon request.

Although Officer Frank failed to provide oral rinses to Mr. Jarvis after saying he would check on it, his failure does not rise to the level of subjective deliberate indifference. The subjective component of the deliberate indifference inquiry looks not only to the defendant's knowledge that an inmate has a serious medical need, but it also considers "the mental state of the defendant regarding the risk of harm." *Est. of Beauford*, 35 F.4th at 1267. Although Officer Frank knew that Mr. Jarvis was experiencing dental pain, there is no evidence to suggest he understood that the lack of oral rinses posed a substantial risk to Mr. Jarvis's health or that it was causing his pain. *Cf. Edmisten v. Werholtz*, 287 F. App'x 728, 733 (10th Cir. 2008) (unpublished) (denying summary judgment for the defendants where the defendants' failure to provide the plaintiff with pain medication, antibiotics, and a prescribed diet resulted in "significant and unnecessary pain"); *Paugh*, 47 F.4th at 1155 (noting that plaintiffs

34

must show their harm was caused by the defendant and that the defendant "acted with the requisite culpable state of mind").

Rather, Officer Frank provided evidence that he understood WCDC medication administration practices to treat oral rinses differently than prescription medication. So, although Officer Frank knew that a medical professional had instructed Mr. Jarvis to use the oral rinses, his subjective understanding of the oral rinses as something less than a prescription medication to treat Mr. Jarvis's pain supports his belief that the failure to provide the oral rinses did not pose a substantial risk to Mr. Jarvis's health. Indeed, only the first emergency services provider included the rinses in the discharge papers. In other words, Officer Frank may have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but there is no evidence that he drew that inference with respect to administration of the oral rinses. *See Est. of Burgaz ex rel. Zommer v. Bd. of Cnty. Commr's*, 30 F.4th 1181, 1186 (10th Cir. 2022) (quotation marks omitted) ("An official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not a constitutional violation.").

Our conclusion here does not mean that an officer's failure to provide a treatment other than a prescribed medication can never rise to the level of deliberate indifference. We have held, for example, that deliberate indifference was a jury issue where jail officials failed to provide an inmate with both prescription medication and special diets that a doctor had ordered. *Hunt*, 199 F.3d at 1223. In that case, we did

35

not distinguish between the failure to provide insulin and the additional failure to provide the inmate with a special diet. *Id.*; *see also Edmisten*, 287 F. App'x at 733 (same). But we focused on the defendant's knowledge that deprivation of either the insulin or the special diet would result in excessive risk to the inmate. *See Hunt*, 199 F.3d at 1223 (noting that the defendant knew the inmate had a heart attack and subsequent bypass surgery because of the defendant's inadequate treatment of his diabetes and hypertension).

Here, Officer Frank knew that Mr. Jarvis's dental condition was causing him pain, but he treated that pain with the prescribed Ibuprofen and knew that other officers transported Mr. Jarvis to the emergency room for additional care when that proved ineffective. Under these circumstances, his failure to provide Mr. Jarvis with oral rinses for the nineteen days between his first and second emergency room visits does not amount to deliberate indifference to Mr. Jarvis's serious medical condition.

Instead, the facts viewed in the light most favorable to Mr. Jarvis could support, at most, that Officer Frank's failure to provide Mr. Jarvis oral rinses was mere negligence. *See Lindwurm v. Wexford Health Sources, Inc.*, No. 02-8101, 2003 WL 22969348, at *2 (10th Cir. Dec. 18, 2023) (unpublished) (affirming summary judgment for the defendants where the plaintiff failed to establish that brief and isolated lapses in his medication posed an excessive risk to his health that the defendants knew about yet disregarded); *cf. Van Riper v. Wexford Health Sources, Inc.*, 67 F. App'x 501, 504 (10th Cir. 2003) (unpublished) (holding that the failure to give the plaintiff his prescribed medication created a fact issue where "Defendants

36

offer[ed] no explanation or justification, medical or otherwise, for the repeated delays"). Thus, Officer Frank's failure to provide Mr. Jarvis oral rinses does not rise to the level of a constitutional violation, as opposed to a negligent or inadvertent failure.

## C.    Clearly Established Law

Having concluded no constitutional violation occurred, we could affirm the district court's decision on the first prong of qualified immunity alone. We proceed, however, to the second step of the analysis and conclude that even if the Officers' actions rose to the level of a constitutional violation, the Officers are entitled to qualified immunity because they did not violate clearly established law.

To overcome a qualified immunity defense, "a right must be clearly established such that a reasonable official would understand that what he is doing violates that right." *Hardy*, 147 F.4th at 1167 (internal quotation marks omitted). This generally requires an on-point Supreme Court or Tenth Circuit decision unless "the clearly established weight of authority from other courts shows that the right [was] as the plaintiff maintains." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021). The plaintiff "need not cite a factually identical case to demonstrate the law was clearly established." *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1257 n.9 (10th Cir. 1998). Rather, the question is whether the "rule's contours [were] so well defined it [was] clear to a reasonable official that his conduct was unlawful in the situation he confronted." *Est. of Beauford*, 35 F.4th at 1268 (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021)). Mr. Jarvis has not met this burden.

37

1.    **Failure to Timely Schedule Appointment**

   *a.    Cited Precedent*

Mr. Jarvis relies on two lines of cases in support of his argument that the Officers violated clearly established law when they failed to schedule his dental appointment within the two-day and seven-day timeframes directed by medical professionals. He discusses cases involving (1) the failure to schedule a medically ordered follow-up appointment and (2) a substantial delay in medical care.

First, Mr. Jarvis asserts that it is clearly established that "an officer's failure to follow a medical professional's order, including scheduling follow-up treatment with a non-emergency medical professional, constitutes deliberate indifference to an inmate's needs in violation of the constitution." Appellant's Br. at 51. Mr. Jarvis focuses on two of our prior cases, one binding and one persuasive, to support his argument. *See Prince*, 28 F.4th at 1048; *Palmer v. Bd. of Comm'rs ex rel. Payne Cnty. Okla.*, 441 F. App'x 582 (10th Cir. 2011).[8]

Mr. Jarvis first relies on *Prince*. Recall, the inmate in *Prince* went to the emergency room three times while he was in custody, and each time the emergency room providers cautioned that he needed to follow up with nonemergency specialists. 28 F.4th at 1040. In fact, in one of the visits, a doctor warned that the failure to

---

[8] As we discuss, the unpublished decisions relied on by Mr. Jarvis are distinguishable. Even if they were comparable, however, they cannot satisfy the clearly established law prong of qualified immunity. *Thompson v. Ragland*, 23 F.4th 1252, 1260 n.3 (10th Cir. 2022) ("An unpublished opinion cannot clearly establish the law. . . .").

schedule a follow-up appointment could result in "permanent disability, pain and possibly death." *Id.* Jail officials never scheduled the plaintiff's follow-up appointments, and his condition rapidly deteriorated over nineteen days. *Id.* The jail nurse ignored the plaintiff's obvious need for emergency medical attention, and he ultimately died. *Id.* at 1040–41, 1048.

In *Palmer*, the plaintiff had an infection caused by a staph bacteria, and a doctor advised him to return for a follow-up visit within two days or to go straight to the hospital if his fever exceeded 100 degrees. 441 F. App'x at 583. The detention officer who transported the plaintiff to the hospital conveyed the doctor's instructions to the jail administrator when he returned to the jail with the plaintiff. *Id.* The plaintiff's condition worsened, but the jail administrator refused to take the plaintiff to the hospital or otherwise obtain medical assistance. *Id.* at 583–84. We held that a reasonable jury "could surely infer from the circumstances that [the jail administrator] knew of and intentionally disregarded a substantial risk to plaintiff's health" because he "knew that the treating physician's directions were to take plaintiff directly to the hospital." *Id.* at 585.

The plaintiff in *Palmer* originally sued the transporting officer. *Palmer v. Bd. of Comm'rs*, 765 F. Supp. 2d 1289, 1297 (W.D. Okla. 2011). The district court held that no reasonable jury could find the transporting officer liable under § 1983 for not scheduling the plaintiff's medical appointment. *Id.* at 1298–99. It explained that the defendant merely transported the plaintiff to the emergency room, had his prescriptions filled, and passed along the instructions and medications to the

defendant who had the duty to care for the plaintiff. *Id.* As a result, "the evidence [was] undisputed that [the transporting officer] took active and reasonable steps to abate any harm to Plaintiff, and the *subjective* component of the deliberate indifference standard cannot be met." *Id.* at 1299. The plaintiff did not appeal the district court's order as to the transporting officer's liability, and it was therefore not at issue in the appeal.

Mr. Jarvis references several other cases explaining that officers are deliberately indifferent to a plaintiff's medical needs when a medical professional's instructions put them on notice that the plaintiff needed urgent medical attention, yet they refused to provide the plaintiff access or timely access to medical care. *See, e.g.*, *Hunt*, 199 F.3d at 1222–24 (reversing the district court's grant of summary judgment where the plaintiff was denied insulin for his diabetes for over a year even though it was prescribed to him); *Zaya v. Sood*, 836 F.3d 800, 805–07 (7th Cir. 2016) (holding that a jury could find deliberate indifference where a doctor specifically ordered that the inmate needed to return in three weeks for a follow-up appointment, but the defendants waited seven weeks to obtain medical attention for the plaintiff despite the doctor's specific warnings regarding the risk of further delay).

Second, Mr. Jarvis argues that it was clearly established in 2023 "that allowing substantial delays in medical care violates the Eighth Amendment." Appellant's Br. at 55. In support, Mr. Jarvis first points to *Al-Turki v. Robinson*, 762 F.3d 1188, 1190–91 (10th Cir. 2014), in which the plaintiff experienced severe abdominal pain for several hours but was denied access to evaluation or treatment, despite repeatedly

requesting assistance. The prison nurse knew that severe abdominal pain could suggest a severe or life-threatening condition, and she knew that the plaintiff's Type II diabetes made him particularly susceptible to certain illnesses. *Id.* at 1191, 1194. But she declined to seek medical assistance for him, leaving him to suffer in pain for hours. *Id.* Under these circumstances, we held that it violated clearly established law to deny an inmate medical care by ignoring repeated complaints of "recognizable symptoms which potentially created a medical emergency." *Id.* at 1195 (quotation marks and brackets omitted).

Mr. Jarvis then relies on our unpublished decision in *Stack v. McCotter*, 79 F. App'x 383 (10th Cir. 2003) (unpublished).[9] In *Stack*, the plaintiff complained of multiple gum infections, which led to sores, bleeding, and infections in his mouth. *Id.* at 386. Jail officials denied multiple requests he submitted asking for dental treatment. *Id.* at 386–87. They denied one request because no guards were available, and they denied another because the dentist would perform only extractions, regardless of what dental work an inmate needed. *Id.* More than three months after the plaintiff first complained, he saw a dentist who diagnosed him with advanced periodontitis. *Id.* at 387. The dentist informed the plaintiff that he would need a follow-up evaluation, but when the plaintiff asked the jail about a follow-up, he did not receive a response. *Id.* Seven months after his pain started, he finally saw a dentist and received the care he needed. *Id.* We held that a factfinder could find the

---

[9] *See supra* note 7.

officers were deliberately indifferent to the plaintiff's dental needs because they knew his condition required dental treatment, they knew his requests were being ignored, and they used the extractions-only policy "as a device for unreasonably delaying treatment. *Id.* at 390.

Mr. Jarvis then asserts that various other cases stand for the similar notion that substantial delays in medical care demonstrate deliberate indifference to a plaintiff's serious medical needs. *See, e.g.*, *Sealock*, 218 F.3d at 1210–12 (holding that the defendants were deliberately indifferent to the plaintiff's medical needs if they knew the plaintiff was experiencing chest pain, that chest pain poses a dangerous risk to health or safety, and they failed to summon emergency assistance); *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1316–17 (10th Cir. 2002) (concluding that factual disputes precluded summary judgment regarding an officer's deliberate indifference because the evidence could establish that the officer ignored a detainee's psychological disorder and withheld medicine to treat it, despite the detainee's repeated pleas for assistance).

b. *Analysis*

These cases follow a similar theme. When we have concluded that an officer was deliberately indifferent based on a delay in scheduling or otherwise providing access to medical care, we identified additional evidence beyond the delay itself. *Hunt*, 199 F.3d at 1224 ("Delays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical problems."

42

(quotation marks omitted)). For example, constitutionally impermissible delays have involved the defendants' knowledge that the inmate's condition was worsening but the defendants did not provide any evaluation or even investigate whether the plaintiff needed medical attention. *See Paugh*, 47 F.4th at 1158. And in cases where the risk of harm has been less severe, the officer has still ignored medical symptoms or requests that suggested a need for immediate, emergency medical attention. *See Olsen*, 312 F.3d at 1317 (concluding a jury could find deliberate indifference where the plaintiff repeatedly asked for assistance during a psychiatric emergency but was ignored). Here, the Officers knew Mr. Jarvis needed to see a dentist, but they were not aware that his symptoms were worsening or that waiting for his dental appointment in early August posed an excessive risk to his health or safety. When his pain did suggest that he needed immediate medical attention, they took him to the emergency room.

Cases where we have held that a reasonable jury could find deliberate indifference for inadequate medical care involved a higher level of officer culpability than what the evidence here provides. For example, officers have been deliberately indifferent for failing to allow an inmate access to medical care where there was evidence that the defendants could have facilitated access but refused to do so. *See Sealock*, 218 F.3d at 1210 (explaining that a jury could find deliberate indifference where the defendant "allegedly refused to drive appellant to the hospital, and told appellant not to die on his shift").

Of course, Mr. Jarvis need not identify a case with identical facts. But the material facts on which this case hinges are not present in any of the cases Mr. Jarvis has provided. None of the cases he referenced involve the question of whether officers can be deliberately indifferent to an inmate's medical needs despite a jail's policy assigning the responsibility to provide that care to someone other than the named defendants. Nor do any of Mr. Jarvis's cited authorities involve facts where the officers believed that those responsible had scheduled an appointment at the earliest time available. He has thus not established that it would be obvious to every reasonable officer that the Officers' conduct was unlawful. *See Redmond v. Crowther*, 882 F.3d 927, 940 (10th Cir. 2018).

**2.    Failure to Provide Oral Rinses**

*a.    Cited Precedent*

Mr. Jarvis argues that Officer Frank is not entitled to qualified immunity for failing to provide Mr. Jarvis with saltwater and peroxide oral rinses because he was on notice that denying an inmate medically prescribed treatment constituted deliberate indifference. Mr. Jarvis again relies on *Prince* as the primary authority to support his argument. In *Prince*, detention officers failed to give the inmate any of his prescription medication over the nineteen days leading up to his death, including those "that were specifically listed in his hospital discharge paperwork." 28 F.4th at 1040–41. This failure constituted subjective deliberate indifference because the officers knew the plaintiff needed the medication but refused to provide it. *Id.* at 1046; *see also Paugh*, 47 F.4th at 1162 (explaining that a jail official was

deliberately indifferent by failing to give the plaintiff necessary medication despite a doctor's specific order that the plaintiff needed it if specific, urgent symptoms started); *Hunt*, 199 F.3d at 1223–24 (concluding that the failure to give a diabetic patient insulin for over a year, leading to a heart attack, constituted deliberate indifference).

> b.    *Analysis*

Mr. Jarvis has not identified a factually analogous case that would permit us to hold that Officer Frank's conduct was clearly unlawful. Officer Frank knew Mr. Jarvis was experiencing dental pain, and he knew that a nurse practitioner recommended that he rinse his mouth with saltwater and peroxide daily. But there is no evidence that Officer Frank understood that any specific risk to Mr. Jarvis's health or heightened pain would result if Mr. Jarvis did not receive these oral rinses. Without additional evidence of deliberate indifference, Mr. Jarvis has not established that Officer Frank's conduct—providing all the medications that an inmate was prescribed but failing to provide an oral rinse that was merely recommended— amounts to a clearly established constitutional violation. As a result, Mr. Jarvis has not met his burden to show that Officer Frank violated clearly established law.

### III.    CONCLUSION

For these reasons, we AFFIRM the judgment of the district court.

**25-8046,** *Jarvis v. Liggett*
**Matheson, Circuit Judge, concurring**:

On the dental appointment issue, I would resolve this appeal on the second step of qualified immunity—that Mr. Jarvis has not shown that any constitutional violation was based on clearly established law.  I therefore join the opinion's discussion of clearly established law and concur in the result.  On the oral rinses issue, I join the opinion.